BIANCO, J.T.C.
This constitutes the court’s formal opinion following trial, with regard to the profit test stage of a property tax exemption determination pursuant to N.J.S.A. 54:4-3.6, concerning property owned by plaintiff, AHS Hospital Corp., d/b/a Morristown Memorial Hospital[1] (the “Hospital”), located within defendant, Town of Morristown, a Municipal Corporation of the State of New Jersey (“Morristown”). The Hospital challenges the denial of its claim for property tax exemption for tax years 2006, 2007, and 2008 with respect to Block 4201, Lot 1.03, Morristown, Morris County, commonly referred to as 68-200 Madison Avenue (the “Subject Property”).

Table of Contents

I. Introduction.. .464
II. Procedural History.. .466
III. Factual Background.. .469
A. Overview.. .469
B. Hospital Organization.. .470
C. Operation and Use of the Hospital.. .474
IV. History of Hospitals... 478
V. Evolution of New Jersey’s Property Tax Exemption For Hospitals up to 1918.. .484
VI. Applicable Law.. .495
A. N.J.S.A. 54:4-3.6 and Case Law.. .495
B. Kimberly School v. Montclair.. .496
C. Post Kimberly School Decisions.. .498
*464 VII. The Hospital’s Relationship with Private For-Profit Physicians. . .500
VIII. Affiliated and Non-Affiliated For-Profit Entities.. .506
A Captive P.C.’s... 507
B. Affiliated For-Profit Entities.. .508
C. AHS Insurance Co., Ltd____510
D. Non-Affiliated For-Profit Entities.. .512
E. Analysis.. .513
IX. Executive Salaries.. .515
X. Employed Physicians’ Contracts... 523
A. Overview.. .523
B. Analysis.. .525
XI. Third Party Agreements... 526
A. Gateway Contract.. .528
B. Aramark Contract.. .529
XII. Gift Shop... 530
A Reasonably Necessary Test...531
B. Analysis.. .533
XIII. Auditorium, Day Care Area, Fitness Center, and Cafeteria. . .533
XIV. Conclusion.. .536
APPENDIX A. ..538
APPENDIX B... 539
I. Introduction
This is a case of first impression: it is the first time a non-profit hospital’s entire property tax exemption has been called into question before this court. It comes at a time when there has been increased scrutiny with regard to property tax exemptions for all non-profit organizations, including hospitals.[2] Historically, *465 American hospitals have been exempt from property taxes (and other taxes) based upon their origins intricately founded in religious and charitable traditions. In New Jersey, property tax exemptions were first codified under the Laws of 1851, under which hospitals qualified essentially as non-profit, charitable institutions. Qualified hospitals were specifically exempt from property taxes in New Jersey beginning with the Laws of 1913, and that exemption is now set forth in N.J.S.A. 54:4-3.6.
Non-profit hospitals have changed significantly, however, from their early origins as charitable alms houses providing free basic medical treatment to the infirm poor. Today they are sophisticated centers of medical care, and in some cases, education, providing a litany of medical services regardless of a patient’s ability to pay.
Recently, New Jersey has experienced the emergence of taxpaying, for-profit hospitals now competing for the same pool of medical professionals and patients as their non-profit forebears. Like their new for-profit competitors, today’s non-profit hospitals have evolved into labyrinthine corporate structures, intertwined with both non-profit and for-profit subsidiaries and unaffiliated corporate entities.
Indeed, our Supreme Court has observed that “a hospital is a complex business vitally affected with a public interest.” Belmar v. Cipolla, 96 N.J. 199, 207, 475 A.2d 533 (1984). Today’s nonprofit hospitals generate significant revenue and pay their professionals salaries that are competitive even by for-profit standards. Furthermore, private physicians and medical practices associated with non-profit hospitals earn and retain income generated on hospital property. The Hospital in this case is no exception.
*466 There is no dispute that “a hospital is a work place for hundreds of people who care for patients, maintain and operate the plant and equipment, and conduct the business of a complicated health care facility.” Id. The Hospital in this matter enjoys a well-deserved reputation for excellence in medical care and education. It has amassed an exemplary staff of doctors, nurses, and other medical professionals — dedicated individuals committed to providing first-rate medical care to the greater Morristown community. If the issue in this case were determinable solely on the quality of care provided by the Hospital and its professionals, the Hospital would clearly prevail.
The court’s decision in this matter, however, must not succumb to emotion, but rather, it must be based on the sufficiency of the evidence and sound legal reasoning. The determination to be made here is purely academic: whether the Hospital, under its current method of operation, satisfies the criteria for property tax exemption as set forth in N.J.S.A. 54:4-3.6 and the case law interpreting that statute. The court has determined it does not. This determination is based substantially on a failure of the evidence. Simply put, the Hospital has failed to meet its burden of proof under law establishing that it meets the criteria to qualify for the exemption.
Accordingly, for the reasons set forth herein, the court finds that the Hospital fails the profit test on several grounds, and therefore fails to qualify for property tax exemption for tax years 2006, 2007, and 2008 pursuant to N.J.S.A. 54:4-3.6. The exemption is denied essentially in its entirety with the few exceptions outlined below.
II. Procedural History
The Hospital timely challenged the denial of its claims for property tax exemptions for tax years 2006, 2007, and 2008 as a non-profit hospital pursuant to N.J.S.A. 54:4-3.6. Morristown maintains that the Hospital is precluded from tax exemption because the operation and use of the Subject Property is being conducted for profit.
*467 The court has previously ruled in this matter that (1) the Subject Property is owned by an entity organized exclusively for a tax-exempt purpose, and (2) nearly all of the Subject property is actually used for hospital purposes. These rulings substantially resolved the first (organizational) and second (use) prongs of the three-part test set forth in Paper Mill Playhouse v. Millburn Twp., 95 N.J. 503, 472 A.2d 517 (1984). The court also previously ruled certain areas of the Subject Property were conducted for profit, thereby violating the third prong of the test in Paper Mill Playhouse, generally referred to as the profit test. Accordingly, those areas of the Hospital are subject to taxation. These rulings are summarized in chronological order below.
In AHS Hospital Corp. v. Town of Morristown, 25 N.J.Tax 374 (Tax 2010), the court granted partial summary judgment in favor of Morristown, finding that leased office space located in the Carol G. Simon Cancer Center and the Goryeb Children’s Hospital (the “leased office space”), and space rented to Au Bon Pain Co., Inc. (the “café”) located in the main hospital building were being operated for profit during the tax years at issue, and therefore failed to satisfy the third prong of the test in Paper Mill Playhouse. The court denied partial summary judgment for the remaining areas of the subject property, finding that a genuine issue of material fact existed as to their tax-exempt status. The Hospital subsequently moved for reconsideration, and oral argument was heard on August 27, 2010.[3]
Then, on August 31, 2010, the Appellate Division released its decision in Hunterdon Med. Ctr. v. Readington Twp., 416 N.J.Super. 127, 3 A.3d 593 (App.Div.2010). In that case, the Appellate Division addressed whether an off-site hospital facility qualified for tax-exempt status under N.J.S.A. 54:4-3.6. The parties were afforded the opportunity to submit briefs addressing what, if any, impact that decision may have on the pending motion for reconsideration. The court then issued its decision in a September 29, 2010 letter opinion, affirming its prior ruling that the café and *468 leased office space were operated for profit and therefore subject to taxation.
In a letter opinion dated November 25, 2013, the court granted partial summary judgment in favor of the Hospital, finding that the Subject Property was owned by an entity organized exclusively for a tax-exempt purpose, thereby satisfying the first (organizational) prong of the test set forth in Paper Mill Playhouse.
The court also granted partial summary judgment in two orders dated April 3, 2014 and June 20, 2014, finding that nearly all of the Subject Property was actually used for Hospital purposes, with the exception of the area used for the Gift Shop,[4] thereby substantially satisfying the second (use) prong of the test articulated in Paper Mill Playhouse,[5] Accordingly, the only substantial issue remaining before the court is whether the remaining areas of the Subject Property satisfy the third prong — i.e., whether those areas are conducted for profit.
Various pre-trial motions were heard before trial on September 8, 2014: discovery motions, motions in Limine, and the Hospital’s motion for partial summary judgment seeking to bar Morristown from asserting certain defense theories. After ruling on these motions, the court proceeded with trial.
*469 At the conclusion of the Hospital’s case in chief, Morristown chose not to present a ease, thereby leaving the matter for the court’s determination as to the sufficiency and credibility of the Hospital’s proofs. Written summations and replies thereto were allowed by the court and submitted by each party.
III. Factual Background

A. Overview

The facts were established through testimony presented during the present trial phase and through prior court proceedings in this matter.[6] The Hospital presented the testimony of lay witnesses Stephen Sepaniak, Esq., Vice President and General Counsel of Atlantic Health System Inc. and for AHS Hospital Corp. during the years at issue; Dr. Joanne Conroy, Vice President of Atlantic Health System, Inc. and President of Morristown Memorial Hospital where she was responsible for the oversight of operations of the Hospital during the years at issue; Kevin Lenahan, CPA, current Vice President of Finance and Chief Financial Officer for Atlantic Health System, Inc. and for AHS Hospital Corp. (he was preceded by, Kevin Shanley, who held those positions during the years in question); Chris Boggs, CPA with Ernst & Young, LLP; and expert witness, Dr. David A. Bjork, Ph.D. of Integrated Healthcare Strategies, who was accepted by the court as an expert in Executive Compensation without objection. Morristown did not call any witnesses.
Dr. Bjork’s expert opinions and testimony, and the relevant facts regarding executive compensation are discussed at length in Section IX of this opinion.
Both Mi'. Sepaniak and Dr. Conroy testified as to the basic structure, organization, operation, and various uses of the Hospital and its corporate affiliates. While their testimony in that regard was generally sufficient and credible to establish some basic facts, *470 the court found their testimony at times to be less than forthcoming, and often lacking sufficient support or foundation. Their testimony was often prompted by leading questions on direct examination, and their memory and recollection of details, facts, and events, particularly on cross-examination, were somewhat selective.
Mr. Boggs’ testimony was of little use to the court. As a CPA, the majority of his clients were large healthcare systems, including Atlantic Health System, Inc., where he assisted in preparing IRS form 990 since 2001. Through the prompting of the Hospital’s counsel, however, he attempted to offer opinion testimony on matters with which he was not involved or had any first-hand knowledge. Moreover, he was neither offered nor qualified as an expert. The objections by Morristown’s counsel in this regard were sustained.
The court found Mr. Lenahan’s testimony to be credible and forthcoming. He provided much of the detail and factual back-up information often lacking with some of the other witnesses’ testimony.
All facts herein are applicable to the tax years at issue. Additional facts are also contained at the beginning of many subject headings, which expand upon and/or are pertinent to that topic.
B. Hospital Organization and Description
“[Morristown Memorial Hospital] first opened in 1893 in a former parsonage on Morris Street, Morristown, N.J____ The hospital moved to its current location in 1949. Encyclopedia of New Jersey 540 (Maxine N Lurie & Marc Mappen eds., 2004).[7] The court has previously recognized and now incorporates herein that
MOM Acquisition Corp. was incorporated in New Jersey as a not-for-profit corporation on April 5,1995. On April 25,1996, the corporation amended its name to Atlantic Health System, Inc. (“Atlantic”). On May 1,1996, Morristown Memorial Hospital ... was merged, along with [Overlook Hospital in Summit, N.J. and Mountainside Hospital in Montclair, N.J.] into Atlantic [Health Systems, Inc.]. Also on May 1, 1996, [Morristown Memorial Hospital] and the other hospitals were *471 reincorporated into AHS [i.e. the Hospital], a New Jersey not-for-profit corporation.[8]
[The court’s letter opinion of November 25, 2013, at p. 2]
Atlantic Health System, Inc. (“Atlantic”) is a holding company that was created with the purpose of being the sole member of the Hospital. Id.
The Subject Property is a 1.1 million square foot campus providing a comprehensive range of hospital services. There are 700 beds, which include 385 surgery beds and 50 beds for neonatal and obstetric care. The Subject Property was exempt from property taxes prior to the years at issue here, and therefore has not been previously assessed for property tax purposes.
In AHS Hospital Corp., the court further recognized that
The Hospital is the owner of the subject property. For the years 2006, 2007, and 2008 ... the Hospital claimed an exemption for the subject property under N.J.S.A. 54:4-3.6. In response, Morristown levied omitted assessments on the subject property for the tax years 2006 and 2007 and a tax assessment for the tax year 2008. The Hospital timely challenged each assessment by filing directly with the Tax Court.
The Hospital is a not-for-profit corporation organized under the laws of New Jersey.[9] It is organized for scientific, educational, and charitable purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, and therefore is exempt from federal income tax. It provides a variety of inpatient and outpatient sendees at the subject property.
[Id. at 377]
Atlantic also acts as a holding company with respect to the various non-profit and for-profit subsidiaries of the Hospital. See Atlantic Health System, Inc. 2006-2008 organizational chart designated as Appendix A.[10] This is Atlantic’s only role in the health *472 care system; it has no employees nor means of generating income. From an ownership perspective, Atlantic owns all the non-profit and for-profit entities that comprised the entire Atlantic Healthcare System.[11] According to Mr. Sepaniak, “Everything ultimately goes up to Atlantic____ That’s where everything stops.”
The board of trustees for the Hospital serves without compensation. The Hospital and Atlantic have a “mirror board” of trustees, which means that the same trustees that serve on the Hospital’s board also serve on Atlantic’s board. Accordingly, meetings of the board of trustees would occur simultaneously for each entity. See Atlantic Health System, Inc., Officers and Executive, 2006-2008 designated as Appendix B.
The Hospital and Atlantic both have sunset provisions in their certificates of incorporation which direct how assets are to be distributed in the event of dissolution. If dissolved within four years, then any assets acquired from the community would be distributed back to the community on a pro rata basis. If dissolved after four years, the assets were to be distributed to such other non-profit organizations as directed by the trustees.
Morristown Memorial Hospital, Overlook Hospital, and Mountainside Hospital maintained relationships with several non-profit and for-profit subsidiaries that were also merged into the Hospital or Atlantic. Each hospital had a non-profit foundation, which was a supporting organization filed under section 509(a)(3) of the Internal Revenue Code. The primary function of these foundations was to solicit and collect donations on behalf of the hospitals and to do fundraising. All the staff in these foundations were employed by the Hospital, and any expenses incurred by the foundations were charged back to, and reimbursed by, the Hospital.
The Hospital owns 100% of the stock in a number of for-profit physician practices commonly known as “captive P.C.’s.” These include five private physician practices that were purchased by the Hospital; the Hospital owns each practice and employs the physi- *473 dans and staff that work there. A Hospital employee served as the single shareholder who held the sole share in trust for Atlantic. In all of these arrangements, that shareholder was Dr. Conroy. See further facts and discussion infra at Section VIII, generally, and Section VIII A, specifically.
There are several other for-profit organizations that are not owned by the Hospital, but are held by Atlantic. Office space occupied by the Hospital’s for-profit affiliates is located at 200 American Road, Morris Plains, New Jersey.
AHS Investment Corp. (“AHS Investment”) is the “chief for-profit company” of Atlantic. AHS Investment owns, leases, and operates real estate, provides home care and nursing services, and serves as the owner of Atlantic’s interest in other for-profit ventures.[12] AHS Investment is owned by Atlantic Health Management Corp., which is held by Atlantic. AHS Investment staff are separately employed from the Hospital staff.
AHS Insurance Company, Ltd. (“AHS Insurance”) is an offshore for-profit corporation wholly owned by Atlantic. AHS Insurance provides coverage for the Hospital as well as its non-profit and for-profit affiliates. Any money expended for the payment of insurance premiums and other expenses on behalf of Atlantic’s non-profit and for-profit affiliates is charged back to those entities and collected from them.[13]
AHS Insurance does not handle claims made against one of its insured and does not have any employees; it is essentially an off *474 shore bank account comprised of cash and equity that is used to pay out claims. Claims made against the Hospital or one of its insured affiliates are processed and managed by Hospital employees in the Hospital’s risk management department. See further facts and discussion infra at Section VIII, generally, and Section VIII C, specifically.
While the for-profit affiliates generally “ran themselves---[they] were ... off-site and ... had their own expertise and ... employees, [if any],”[14] and the trustees that serve on the boards of the non-profit affiliates often serve as statutory officers for the for-profits. Statutory officers are not involved in the day-to-day operations of the for-profit affiliates, but do attend quarterly presentations.[15] See Appendix B.
C. Operation and Use of the Hospital
The Hospital is a licensed acute care facility, teaching hospital, and level 2 trauma center[16] in New Jersey[17] that provides a broad range of medical services with respect to trauma, chronic illnesses, in-patient and out-patient surgery, and obstetrics. In order to *475 provide the foregoing services the Hospital must satisfy a number of staffing requirements: maintaining physicians (i.e. anesthesiologists, radiologists, pathologists) in the emergency department at all times, as well as personnel to perform ancillary services such as x-ray, lab, and other sophisticated testing.
As a teaching hospital, the Subject Property implements a program to educate its residents and medical students, which is approved by the American Council on Graduate Medical Education (ACGME). Of the 500 acute care facilities in the United States, the Hospital is among 365 hospitals with such a program, and only 185 of those programs are of similar size as the Hospital’s program. The teaching program educates residents in the fields of internal medicine, pediatries, surgery, dentistry, podiatry, and obstetrics.
As a non-profit hospital, the Subject Property treats all patients that come through its door regardless of their ability to pay. The patient population falls into one of several categories: Medicare[18] patients, Medicaid[19] patients, commercially-insured patients, and self-pay patients. Medicare patients are the “most common utiliz-ers of healthcare.” There is no profit margin with respect to the treatment and care of Medicaid patients.
The self-pay patients are patients with no insurance. While these patients are still responsible for paying their medical bills, the Hospital considers their ability (or inability) to pay and would “[try] to create a payment structure that was fair and reasonable.” The Hospital also offered a number of programs to serve the patient population that had no means to pay (i.e. charity care). These programs included the South Street Clinic as well as treatment for diabetes and obesity. Approximately 8% of the *476 Hospital’s patients fell into this charity care category. The cost of providing these services is paid out of the Hospital surplus.[20]
Some of the programs offered by the Hospital were “loss leaders” — programs that cost more money to implement than they bring in each year. For example, a typical pediatrician in a hospital setting may generate $100,000 in losses each year. This is because there is a high percentage of Medicaid and charity care associated with pediatries. Medicaid only provides a 40% reimbursement for these services. In some instances, Atlantic was only reimbursed four to ten cents on the dollar. Neonatal care, on the other hand, was profitable; it was reimbursed by Medicaid at higher rates, at approximately 85% to 90% of cost.
The Hospital’s decision to offer loss leader programs was driven by community needs rather than the Hospital’s financial or economic needs. These include the pediatries and obstetrics departments, and programs such as Fit America, which was devoted to making sure kids were not sedentary in schools, Teen FX, which was an online support website for adolescent issues, diabetes programs, support groups, and HIV treatment and education.
There are three types of physicians that provide care at the Subject Property: employed physicians, voluntary physicians, and exclusive contract physicians. “All of them have to be approved as members of the medical staff, ... [a]nd ... be approved within a department.”
Employed physicians were selected by the Hospital based on “community need” with respect to certain fields of medicine, such as general pediatric care and adolescent psychiatry.[21] The Hospi *477 tal also employed six trauma surgeons. Because trauma surgery is an in-patient service, these surgeons are “inextricably linked” to the hospital with respect to how they provide care. The employed physicians were given employment contracts containing incentive compensation provisions. See further facts and discussion of employed physician contracts infra Section X.
The second group of physicians that practice at the Hospital are “voluntary physicians.” Voluntary physicians are private, for-profit, self-employed physicians that practice in the community and have privileges to treat patients at the Hospital. These physicians sometimes rented hospital space and treated patients on an out-patient basis. Other times, voluntary physicians actually admitted patients to general surgery or general medicine. Approximately 83% of the patients admitted to the Hospital were admitted by voluntary physicians. The voluntary physicians were also able to participate in the Hospital leadership and were given the opportunity to be elected at medical staff meetings held twice annually. During the years at issue, there were approximately 1,200 private, voluntary physicians with privileges at the Subject Property.[22] This accounts for the majority of physicians that actually provide care at the Subject Property.
The third group of physicians that practiced at the Hospital were doctors with exclusive contracts with the Hospital. These physicians provided medical services in the fields of radiology, anesthesiology, pathology, and emergency services; they are commonly referred to as “RAP doctors.” There were approximately 120 to 150 physicians that had exclusive contracts with the Hospital. The RAP doctors admitted 0% of the Hospital’s patients, but they did treat Hospital patients. Like the voluntary physicians, the RAP doctors were also able to participate in the Hospital medical leadership: “they participated fully in medical staff functions ... There was really no discrimination between who was a *478 private physician, who was employed and who had an exclusive contract.” Having an exclusive contract arrangement with RAP doctors was a common practice in New Jersey. See further facts and discussion of the voluntary physicians and exclusive-contract physicians (RAP doctors) infra at Section VII.
The Hospital billing was separate from voluntary physicians’ or RAP doctors’ billing. The hospital would charge the patient a “technical” fee, and the voluntary physicians or RAP doctors charged the patient a separate “professional” fee. The hospital’s technical bill paid for nurses, technology, overhead and the physician bill just paid for the physician’s services. Approximately 36% of the Hospital’s revenue came from Medicare reimbursement. The Hospital has no input on reimbursement amounts from Medicare. Medicare covers 96% to 98% of the Hospital fee. About 20% of the Hospital’s revenue comes from Horizon Blue Cross reimbursement.[23] About 3% to 4% of the Hospital’s revenue comes from Medicaid which covers approximately 40% of the Hospital fee.
The Hospital negotiated the fee schedule for its employed physicians with the insurance companies. The voluntary physicians, however, negotiated a separate fee for their services.
Employed physicians, voluntary physicians, and RAP doctors offer their services and work throughout the Subject Property; there is no limitation or restriction on where they actually practice. Voluntary physicians and RAP doctors not only provide care throughout the Hospital, but they use the Hospital facility to generate private medical bills to patients. These bills are charged directly by the private physicians to the patients, and all the money received for their services goes directly to them.
IV. History of Hospitals
According to the Hospital, “[i]f Morristown’s position was accepted by the Court [i.e. the operation and use of the Subject *479 Property is being conducted for profit], the traditional and historic means by which hospitals throughout New Jersey provided hospital services will have always violated the Statute and the Statute is a nullity.”
In essence, the Hospital contends that “the traditional and historic means by which hospitals ... provided hospital services” are the same today as they were at the time New Jersey first adopted a specific tax exemption for “[a]ll buildings actually used for ... hospital purposes.” L. 1913, c. 278, § l.[24] Moreover, any evolution in the way hospitals provide services occurred before L. 1913, c. 278, § 1 was enacted, and therefore, was known to, and condoned by, the Legislature in adopting that statute and subsequent amendments thereto. The court rejects the Hospital’s contentions.
The record of trial reflects that the Hospital offered no acceptable testimony or other evidence as to “the traditional and historic means by which hospitals ... provided hospital services.”[25] On that basis alone the court must reject these contentions as a failure of proof. See Greenblatt v. Englewood City, 26 N.J.Tax 41, 55-56 (Tax 2010) (rejecting plaintiffs expert report as unsupported by testimony or other facts). However, in an effort to give due consideration to the Hospital’s contentions, and given the dearth of evidence, the court found it useful and necessary to review a number of scholarly works and court opinions that provide, to the court’s satisfaction, a clear and uncontroverted *480 history of the development and evolution of hospital services in America. The court found one law review article, in particular, that provided a concise and instructive recitation of that history:
The first American hospitals were established in the mid-eighteenth and early nineteenth centuries as charities for the diseased poor and the mentally ill. The helplessness of the diseased poor led to the creation of the first American hospital — the Pennsylvania Hospital.[26] The hospital was 100 percent charitable — developed with donations from Pennsylvania’s elite along with matching funds from the Pennsylvania Assembly — and had a staff of volunteer physicians. [27] Those who could afford to do so sought the preferred method of care — treatment in comfort of their own homes. Physicians routinely made home visits to monitor patients and even performed invasive surgical procedures in a patient’s kitchen. Very few physicians practiced medicine in a hospital because the hospital was not yet 'central to the practice of medicine. ’ In fact, care at a hospital was looked at with disdain as the hospital was considered ‘a primitive institution treating [a] ... socially marginal constituency____’ Beyond this, hospitals were traditionally viewed as the place people went to die. Surgical mortality rates were actually higher in a hospital than they were if the surgery was performed at home. Thus, the hospital was considered a “house of death.”[28]
*481 As a result of technological advances and increasing concern for hygiene and sanitation, hospitals underwent somewhat of a facelift in the late nineteenth and early twentieth centuries. Self-paying patients began to populate hospitals at increasing rates. By 1903, self-paying patients accounted for more than seventy percent of the operating income for hospitals in over a dozen states and U.S. territories. With the rise of surgery, hospitals became attractive to the more affluent members of society, as hospitals were expensive and catered to the whims of paying patients. By 1920, the number of hospitals across the country had grown dramatically — totaling over six thousand. These hospitals had 'emerged os the center of advanced medical practice. [29] Even though they were originally viewed as ‘institutions whose use stigmatized patients, the hospital had become an emblem of the community.’ In staunch contrast to their humble beginnings, hospitals had become models for sanitary and coordinated health care.
As hospital-based medicine evolved into the preferred method of medical care, hospitals became ‘peeulia/r hybrids economically. ’ They were still charities because private donations accounted for the vast majority of the money that the hospitals used as capitalfor buildings and other investments. Beyond these capital expenditures, hospitals earned on their affairs much more like a business. Having a greater number of paying patients would increase the income of the hospital and provide it with the resources it needed to expand and furnish paying patients with more advanced medical facilities. With the goal of increasing its income, hospitals expanded to meet the demand it created with patients who could afford to pay for its services.
Around this same time, the 1913 federal income tax law took affect, [sic.] This tax law was particularly relevant to hospitals because it exempted them from any income tax liability if the hospitals could prove they were non-profit charities. Given the charitable origin of hospitals, legislators had no problem classifying them as charitable institutions.^[30] Case law from this era indicates that opposi *482 tion to this classification grew as it became difficult to reconcile the tax exemption for institutions whose evolution made them less and less charitable. The Internal revenue Service responded with criteria to determine non-profit hospitals’ charitable status.
[Tamara R. Coley, Extreme Pricing of Hospital Care for the Uninsured: New Jersey’s Response and the Likely Results, 34 Seton Hall Legis. J. 275, 279-281 (2010) (emphasis added).[31] See also John D. Columbo, The Charitable Status of Nonprofit Hospitals: Toward a Donative Theory of Tax Exemption, 66 Wash. *483 L.Rev. 307, 318-19 (April 1991) (“The role of hospitals as ‘almshouses for the poor’ changed rapidly during the first half of the twentieth century____”) (emphasis added), cited by Advance Housing, Inc. v. Township of Teaneck, 215 N.J. 549, 74 A.3d 876 (2013). See generally Morris J. Vogel, The Invention of the Modern Hospital (1980); Paul Starr, The Social Transformation Of American Medicine (1982); C. Rosenberg, The Care of Strangers (1987) (history of American hospitals); R. Stevens, In Sickness and in Wealth: American Hospitals in the Twentieth Century (1989).]
The court finds that there is no dispute among any of the scholarly works it reviewed relating to the history of hospitals in this country. Accordingly, the court takes judicial notice of those scholarly works cited in this section and in the footnotes. The court is satisfied that non-profit hospitals today bear little, if any, resemblance to hospitals in the 18th, 19th, and early 20th centuries. The court has found no support for the Hospital’s contention that contemporary non-profit hospitals operate today as they did at the time New Jersey first adopted a specific tax exemption for “[a]ll buildings actually used for ... hospital purposes.” L. 1913, c. 278, § 1. Clearly, hospitals were evolving at that time, and, as the article suggests, “hospitals became ‘peculiar hybrids economically.’ They were still charities ... [but] carried on their affairs much more like a business.” Coley, supra, 34 Seton Hall Legis. J. at 81 (emphasis added).
Our Supreme Court most recently observed in Terry Kuchera v. Jersey Shore Family Health Center, 221 N.J. 239, 251, 111 A.3d 84 (2015),[32] that there is a new reality regarding how modem hospitals operate and function, recognizing:
*484 Indeed, in various contexts, courts throughout the country have recognized, the evolving character of hospitals and healthcare. A hospital is no longer viewed as simply a facility at which medical professionals treat their patients. See Clark v. Southview Hosp. & Family Health Ctr. [68 Ohio St.3d 435], 628 N.E.2d 46, 53 (Ohio 1994) (explaining courts have recognized “the status of the modern-day hospital and its role in contemporary society” as “the only place where the best equipment and facilities and a full array of medical services are available at any time without an appointment. With hospitals now being complex full-service institutions, the emergency room has become the community medical center, serving as the portal of entiy to the myriad of sendees available at the hospital”); Burless v. W. Va. Univ. Hosps., Inc. [215 W.Va. 765], 601 S.E.2d 85, 93 (W.Va.2004) (noting “[t]he public’s confidence in the modern hospital’s portrayal of itself as a full service provider of health care”); Lewis v. Physicians Ins. Co. [243 Wis.2d 648], 627 N.W.2d 484, 493 (Wis.2001) (“As full-care modern health facilities, hospitals are no longer mere structures where physicians treated and cared for them patients.” (internal quotation marks and citation omitted)).
Hospitals now provide comprehensive services beyond acute inpatient care, and our conception of “hospital purposes” needs to expand to reflect the many health-related pursuits of the modern hospital.
[Id. (emphasis added).]
Clearly non-profit hospitals evolved into their present-day model over centuries — a transformation that continued well into the 20th century.[33] However, despite this evolution, hospitals continued to benefit from tax exemptions due to their long tradition of providing free charitable care for those in need.
V. Evolution of New Jersey’s Property Tax Exemption for Hospitals up to 1918
As American hospitals have evolved from their charitable origins dating to the mid-18th century, so too have our laws granting tax exemptions to hospitals, originally as charitable institutions for charitable purposes, and later as associations or corporations for hospital purposes. A review of the evolution of the property tax exemption for hospitals is helpful and instructive. In its review, *485 the court focused solely on the pertinent provisions of the various statutes that pertain to charitable purposes, for all laws prior to 1913, and then specifically to hospital purposes for laws beginning in 1913 and beyond. The court also reviewed the ease law interpreting the relevant statutes, as well as the historical treatment of hospitals for tax purposes under English and New Jersey common law. The court’s purpose in this review is to glean legislative intent at the time New Jersey first adopted a specific tax exemption for “[a]ll buildings actually used for ... hospital purposes” in L. 1913, c. 278, § 1. The 1913 law and its subsequent amendment by L. 1918, c. 236, § 203, serve as the basis for the modern exemption statute set forth in N.J.S.A. 54:4-3.6.
The first law in New Jersey conceivably exempting hospitals from taxation as “buildings erected and used exclusively for charitable purposes,” was L. 1851, p. 271, § 5, II (Supplement to “An act concerning Taxes April 14, 1846”).[34] While the statute does not specifically name hospitals, it provides in pertinent part: “[B]e it enacted, That the following persons and property shall be exempt from taxation, [including] ... all buildings erected and used exclusively for charitable purposes, with the lands on which they are erected and the furniture used therein; ...” Id. (emphasis added).
Our case law and common law have long recognized hospitals as charitable institutions organized for charitable purposes. Chief Justice John Marshall, writing for the majority of the United States Supreme Court, observed in Note 1 of the Appendix, that “[t]he statute of Elizabeth is now considered the principal source of the law of charities____” Trs. of Phila. Baptist Asso. v. Hart’s Ex’rs, 17 U.S. 1, 71, 4 Wheat. 1, 4 L.Ed. 499 (1816) (emphasis added). However, English statutes and case law prior to the Statute of Elizabeth, specifically recognizing hospital uses as charitable uses, can be traced back to the reign of Edward II in the 14th century.[35]
*486 In its preamble, the Statute of Elizabeth, a/k/a “The Charitable Uses Act of 1601,” (43 Elizabeth ch. 4), gives guidance as to what purposes are charitable.[36] They included: “gifts, devises, & c. for the relief of aged, impotent, and poor people; the maintenance of sick and maimed soldiers and mariners; ...” Id. at 72 (emphasis added). Chief Justice Marshall further observed that:
As to what charities are within the statute [of Elizabeth], they are enumerated with great particularity in Duke on Charitable Uses, and Comyris Digest, tit. Charitable Uses, (N.l.) ... But there are certain uses, which, though not within the letter, are yet deemed charitable within the equity of the statute [of Elizabeth]; such as money given ... for the setting up a hospital for the relief of the poor; ... [Id. at 78 (emphasis added).]
New Jersey’s case law and common law, have also invoked the Statute of Elizabeth with regard to charitable purposes in this state. Writing for the majority, Chief Justice Beasley found:
I do not understand that there is any difference whatever between the common law of England and the law of this state upon the point as to what constitutes the legal *487 definition of a charity. And by this common law I mean that system, ... which has grown up in a series of decisions founded, in part, upon 43d of Elizabeth, ch. 4, (the statute of charitable uses)[37] Upon the questions what is, err what is not, a charitable use we have no criterion but the rules of the common law, and those rules, consequently, are obligatory upon us.
[Thomson’s Ex’rs v. Norris, 20 N.J. Eq. 489, 522 (E. & A.1869) (emphasis added).]
Clearly L. 1851, p. 271, § 5, II envisioned that hospitals, as charitable institutions “used exclusively for charitable purposes” within the meaning of the 1851 statute, “and the lands on which they are erected,” could have met the requirements for tax exemption.
L. 1862, c. 194, p. 344, § 17 (Further Supplement etc.) limited the land exemption to “only ... so much land as necessary to the fair enjoyment of the buildings, not exceeding five acres.” Id. The law otherwise had no effect on the ability of charitable hospitals to claim tax exemption except for the size and necessity of the land.[38]
L. 1866, c. 487, p. 1078, § 5, II further amended § 5, II with regard to the exemption of buildings rented for exempt purposes, but did not affect the exemption for “buildings used exclusively for charitable purposes [or] the land whereon the same are erected.” Id. The wording of the 1866 bill was incorporated without change in the Revision of 1877, p. 1152, Taxes § 64, II. In State v. Collector of Chatham (a/k/a Sisters of Charity v. Chatham,), 52 N.J.L. 373 (E. & A.1890)[39] the Court interpreted the phrase: “all *488 buildings used exclusively for charitable purposes----” as contemplated within the 1866 statute, p. 1151, § 61 (emphasis added) to mean “devoted solely to charitable uses.” Id. at 375 (emphasis added). In essence the Court determined that, “exclusively” meant “solely.”
L. 1894, c. 233, p. 354 (A Further Supplement to L. 1866, c. 487, p. 1078, § 5, II) added a specific tax exemption for “buildings used as asylums or schools for the care, cure nurture, maintenance and education of feebleminded or idiotic persons and children, provided such institutions are duly incorporated under the laws of this state ...,” but left intact the earlier provisions of the 1866 law.[40]
Under this law, there are a number of cases that interpreted the clause “all buildings used exclusively for charitable purposes, with the land whereon the same are erected, and which may be necessary for the fair enjoyment thereof.” L. 1894, p. 354; Gen. Stat., ¶ 3320, § 200 (emphasis added).
In Trustees of the YMCA v. Paterson, 61 N.J.L. 420, 39 A. 655 (Sup.Ct.1898), the court found that the subject property was not used exclusively for charitable purposes, meaning “eleemosynary purposes — purposes connected with the distribution of charity, i.e., of aid to the needy.” Id. 422, 39 A. 655. See also Sisters of Peace v. Westervelt, 64 N.J.L. 510 (Sup.Ct.1900) (following the precedent in Trustees v. Paterson, supra.)
In Cooper Hospital v. Camden, 68 N.J.L. 691, 54 A. 419 (E. & A.1903),[41] for the first time the Court focused on the actual use of *489 the property. The taxpayer hospital owned a tract of land that was separate from the property on which it conducted its charitable work. Although the land was used in support of its charitable purpose, the Court found that the separate tract was not actually used in the taxpayer’s charitable work. This case stands for the proposition that “mere ownership of land by a charitable institution does not exempt the land, and that its exemption depends upon its actual devotion to the work of charity.” Id. at 707, 54 A. 419.
For additional eases interpreting the clause “all buildings used exclusively for charitable purposes” of the 1894 statute, see Paterson Rescue Mission v. High, 64 N.J.L. 116, 44 A. 974 (Sup.Ct.1899) (stating that “where the objects and purposes of the institution are wholly charitable, with no element of private gain, the receipt of compensation from those who enjoy the benefits do not affect its charitable nature.”); Cooper Hospital v. Burdsall, 63 N.J.L. 85, 42 A. 853 (Sup.Ct.1899) (following the precedent in Sisters of Charity v. Chatham, a.k.a. State v. Chatham, supra, finding the hospital was “derived by gift for purely charitable purposes, and its affairs are conducted gratuitously and exclusively for benevolent objects.”)
In 1896, the Report of the Commission Appointed by Governor Griggs to Investigate the Subject of Taxation, 81 stated “That our list of ‘Exemptions’ or property exempted from taxation is now unduly large and increasing, and needs revision and reducation ...” Consequently, in L. 1901, c. 142, p. 300 there is emphasis on whose occupying the exempt building and the income generated from the building:
1. The following property shall be exempt from taxation, namely, any building used for purposes considered charitable under the common law; provided, the said building is occupied in whole by the organization owning it, and the entire income from said building is used for• the purposes of such organization, although supported parity by fees and charges received from the beneficiaries or from those who receive the advantages of such charitable purposes, with the land whereon the *490 same are erected, and which may be necessary for the fair enjoyment thereof, and the furniture and personal property used therein.
[Id. (emphasis added).]
This is the first time, by statute, that tax exemption for property used for charitable purposes was specifically tied to ownership, occupation, and the income generated: buildings used for charitable purposes had to be owned and occupied by the charitable institution claiming the tax exemption “and the entire income from said building” had to be “used for the purposes of such organization.” Id. Furthermore, this statute contains the first specific reference to charitable purposes under the common law, the origins of which, as detailed earlier, go back to the Statute of Elizabeth.
L. 1903, c. 208, § 4, p. 394, A-53 continued to focus on the use and income of charitable institutions in granting tax exemption to:
[A]ll buildings used exclusively for puiposes considered charitable, under the common law, ... with the land whereon the same are erected and which may be necessary for the fair enjoyment thereof, and the furniture and personal property used therein, ... the exemption described in this paragraph of a building and land used for charitable purposes shall extend to cases where the charity is supported partly by fees and charges received from or on behalf of beneficiaries occupying said building, provided the building is wholly controlled and the entire income therefrom is used by the charitable corporation for its charitable puiposes;
[Id. (emphasis added).]
In Inst. Of Holy Angels v. Ft. Lee, 80 N.J.L. 545 (Sup.Ct.1910), the court found that property tax exemption for a charitable purpose under the relevant portions of the 1903 law required that “the building must be actually used, and it was held under the Tax Act of 1866, prior to the present revision of 1903, that a building intended for a charitable use, but not yet used for that purpose, was not exempt from taxation.” Id. at 546, citations omitted. This court observes, however, that while the holding in Inst. Of Holy Angels, supra, is consistent with earlier court rulings, the specific provision of the 1903 statute that conceivably could apply to hospitals as “purposes considered charitable, under common law” required only that buildings be “used exclusively” for such purposes; it did not require such buildings to be “actually and exclusively used” for charitable purposes as it did for other purposes.
*491 In Bancroft Training School v. Haddonfield, 82 N.J.L. 192, 82 A. 20 (Sup.Ct.1911), the court found that
Another important change in or addition to [paragraph 4 of the Tax act of 1903] is found in the concluding provision, namely that ‘the exemption described in this paragraph of a building and land used for charitable purposes shall extend to cases where the charity is supported partly by fees and charges received from or on behalf of beneficiaries occupying said building, provided the building is wholly controlled and the entire income therefrom is used by the charitable corporation for its charitable purposes.’ This clause shows clearly the legislative purpose to grant immunity to charities which are charitable in fact, although they may be partly supported by fees received from beneficiaries who are able to pay them, and to exclude from the privilege of exemption those enterprises which may be benevolent in spirit but which are concluded for private gain.

A charity conducted for profit would be an anomaly both in law and ethics.

[Id. at 3-5 (emphasis added).]
The court in Bancroft Training School concluded that in adopting the Tax Act of 1903, the Legislature intended that “All buildings shall be exempt which are actually and exclusively used ... and owned by [charitable] corporations ..., provided the buildings are wholly controlled and the entire income therefrom is used by the charitable corporation for its charitable purposes.” Id. at 5-6 (emphasis added).
“Section three, subsection four” of the 1903 law was amended by L. 1913, c. 278, § 1, A159, which provided property tax exemption for
All buildings actually used for colleges, schools, academies, seminaries, associations and corporations organized exclusively for the moral and mental improvement of men or women, or for religious, charitable, benevolent or hospital purposes; or for one or more such purposes, not conducted for profit ... also all buildings used exclusively for purposes considered charitable under the common law, ... with the land whereon the same are erected and which may be necessary for the fair enjoyment thereof, and the furniture and personal property used therein;
[Id. (emphasis added).]
This marks the first time that property tax exemption was specifically available for “hospital purposes” apart from “buildings used exclusively for purposes considered charitable under the common law,” under which hospitals may have qualified for tax exemption in the past. Id. Under the 1913 law, buildings actually used but not exclusively used for “hospital purposes,” could qualify for the exemption. Id.
*492 In Wash. Camp. v. Bd. of Equalization of Taxes, 87 N.J.L. 53, 93 A. 856 (Sup.Ct.1915), while acknowledging that the 1913 statute eliminated the exclusivity requirement, the court nonetheless ruled that the non-eharitable use of part of the subject building destroyed the exemption for the building as a whole. The court determined that the amendment was not intended to “extend exemption to eases of permanent partial occupancy of buildings for business or other non-charitable purposes.” Rather, the court interpreted the 1913 amendment to “avoid claims that such exemption would be forfeited notwithstanding the actual bona fide use of the entire building for benevolent purposes, if occasional use were made of it for other purposes----”
However, in Pingry Corp. v. Hillside, 46 N.J. 457, 462, 217 A.2d 868 (1965) the Court determined that “in 1913 the word ‘exclusively’ was deleted [as to the use of the buildings]---- The deletion of the more restrictive term ‘exclusively would indicate that the legislature intended to broaden the exemption.”
Furthermore, under the Tax Act of 1913, hospital purposes could qualify for exemption as long as they were “not conducted for profit.” L. 1913, c. 278, § 4. Moreover,
The exemption ... of a building and land used for charitable, benevolent or religious purposes [but not hospital purposes] shall extend to cases where said building and the charitable, benevolent or religious work therein carried on is supported partly by fees and charges received from or on behalf of the beneficiaries using or occupying the said building provided the building is wholly controlled and the entire income therefrom is used for said charitable, benevolent or religious purposes.
[Id. (emphasis added).]
According to the historical account in Section IV of this opinion, “[b]y 1903, self-paying patients accounted for more than seventy percent of the operating income for hospitals in over a dozen states and U.S. territories,” Coley, supra, 34 Seton Hall Legis. J. at 280. Regardless, the Tax Act of 1913 included no provision extending tax exemption to buildings or land used for hospital purposes “where said building and the ... [hospital] work therein carried on is supported partly by fees and charges received from or on behalf of the beneficiaries using or occupying the said building.” L. 1913, c. 278, § 4. Moreover, assuming arguendo that *493 this specific extension of the tax exemption did somehow apply to buildings used for hospital purposes, then “the entire income therefrom [i.e. from the building]” would have to be used for hospital purposes. Id. The existence of private, for-profit doctors who earned and retained fees generated on hospital property would have defeated a claim for property tax exemption under the clear language of the Tax Act of 1913.
Finally, L. 1918, c. 236, § 203 provided property tax exemption to:
All buildings actually and exclusively used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women or children, or for religious, charitable or hospital pmposes, or for one or more of such purposes ... the land whereon any of the buildings hereinbefore mentioned are erected, and which may be necessary for the fair enjoyment thereof, and which is devoted to the purposes above mentioned and to no other purpose, and does not exceed five acres in extent; the furniture and personal property in said buildings if used in and devoted to the purposes above mentioned ... provided, however, in the case of all of the foregoing, that said buildings, or the land on which they stand, or the associations, corporations, or institutions using and occupying the same us aforesaid, are not conducted for profit, except that the exemption of the buildings and lands used for charitable, benevolent or religious purposes shall extend to cases where the charitable, benevolent or religious work therein carried on is supported partly by fees and charges received from or on behalf of beneficiaries using or occupying the said building, provided the building is wholly controlled by and entire income therefrom is used for said charitable, benevolent or religious purposes ... provided further, that the foregoing exemptions shall apply only where the association, corporation or institution claiming the exemption owns the property in question and is incorporated or organized under the laws of this State and authorized to cany out the purposes on account of which such exemption is claimed; the funds of all charitable and benevolent institutions and associations collected and held exclusively for the sick and disabled members thereof, or for the widows of deceased members, or for the education, support or maintenance of the children of deceased members, and all endowments and funds held and administered exclusively for charitable, benevolent, religious or hospital purposes within this State.
Ud. (emphasis added, in part).]
The 1918 statute restored the exclusivity element to the use requirement last seen in the 1903 statute. It further emphasized the prohibition of profit making activities in the buildings, on the land, or by the entities claiming the exemption. Furthermore, the entity claiming the exemption had to own the property, and be organized for “the purposes on account of which such exemption is claimed.” Id. In essence, the 1918 statute is a precursor to the *494 three prong test established decades later in Paper Mill Playhouse.
In summary, this exhaustive review of the evolution of the property tax exemption for hospitals reveals that hospitals have been eligible for property tax exemption since, at least, the 14th century. While there were some specific references to hospital uses in the earliest statutes, since the Statute of Elizabeth, hospitals could claim this exemption via their origins and traditions as charitable institutions. The English common law treatment of hospitals as charitable institutions was incorporated into New Jersey common law as well. In fact, our courts have found that there is no difference between English common law and New Jersey common law with regard to the law of charities which dates to the Statute of Elizabeth. When New Jersey adopted its very first tax exemption statute in 1851, hospitals could qualify for the exemption under the charitable purposes provision of that act. Several amendments followed in the ensuing years.
This brings us to the Tax Act of 1913, wherein, for the first time, hospital uses were specifically eligible for tax exemption, separate and apart from charitable uses. Perhaps this reflects the Legislature’s recognition of the evolving importance of hospitals as healthcare providers at that time, and the differing purposes between hospital uses and charitable uses.[42] While the removal of the exclusivity requirement in 1913 may suggest an easing of the exemption eligibility requirements, it is clear that the Legislature in 1913 did not condone the use of hospital property for-profit. The reinstitution of the exclusivity requirement into *495 the 1918 amendment reflects the Legislature’s recognition of various abuses of the tax exemption statute that required further tightening of the exemption applicability requirements.
The court is satisfied that at the time of the adoption of the 1913 Tax Act, hospitals operated much as they did in the 19th century, essentially as charitable institutions providing basic medical care to the poor. This conclusion is supported by the fact that there are a minimal number of cases from that time challenging the exemption for hospitals when other organizations, such as schools and religious uses, where often challenged. The Legislature was aware of the evolving nature of hospitals during this time, and the law providing for property tax exemption and its subsequent amendments recognized this evolution. Certainly, the Hospital has provided no evidence or legal precedent that would lead this court to another conclusion.
VI. Applicable Law
A. N.J.S.A. 54:4-3.6 and Case Law
This court recognized in AHS Hospital Corp., and now reiterates here, that the following statutes and case law are applicable to the legal determination of property tax exemption in this state:
N.J.S.A. 54:4-3.6 [43] provides in pertinent part that:
The following shall be exempt from taxation under this chapter ... all buildings actually used in the work of associations and corporations organized for hospital purposes, provided that if any portion of a building used for hospital purposes is leased to profit-making organizations or otherwise used for purposes which are not themselves exempt from taxation, that portion shall be subject to taxation and the remaining portion only shall be exempt ... provided, in case of all the foregoing, the buildings, or the lands on which they stand, or the associations, corporations or institutions using and occupying them as aforesaid, are not conducted for profit.... The foregoing exemption shall apply only where the association, corpora *496 tion or institution claiming the exemption owns the property in question and is incorporated or organized under the laws of this State and authorized to carry out the purposes on account of which the exemption is claimed —

[Ibid.]

Further, this court has previously stated that:
To secure an exemption under N.J.S.A. 54:4-3.6, the following three criteria must be met: “(1) [the owner of the property] must be organized exclusively for the [exempt purpose]; (2) its property must be actually and exclusively used for the tax-exempt purpose; and (3) its operation and use of its property must not be conducted for profit.” Hunterdon Med. Ctr. v. Township of Readington, 195 N.J. 549, 562, 951 A.2d 931 (2008) (quoting Paper Mill Playhouse v. Millburn Township, 95 N.J. 503, 506, 472 A.2d 517 (1984)) (alternations in original).
It has long been recognized that “all property shall bear its just and equal share of the public burden of taxation.” Princeton University Press v. Borough of Princeton, 35 N.J. 209, 214, 172 A.2d 420 (1961). "Statutes granting exemption from taxation represent a departure and consequently they are most strongly construed against those claiming exemption.” Ibid. Accordingly, “[t]he burden of proving a tax-exempt status is upon the claimant.” Ibid. Notwithstanding, N.J.S.A. 54:4-3.6 “must also be construed reasonably so that the apparent legislative purpose is not destroyed.” City of Long Branch v. Monmouth Medical Center, 138 N.J.Super. 524, 531, 351 A.2d 756 (App.Div.1976) (citations omitted). The Supreme Court of New Jersey has written that “[t]he use-for-an exempt-purpose [prong] is superfluous when property is otherwise ineligible because a for-profit activity is conducted on it or because the property itself is not owned by an entity eligible for tax exemption under N.J.S.A. 54:4-3.6.” Hunterdon Med. Ctr., supra, 195 N.J. at 566, n. 13, 951 A.2d 931. The court finds that resolution of the third prong is dispositive for both motions.
The test for whether property is used for profit is a “pragmatic inquiry into profitability____ [A] realistic common sense analysis of the actual operation of the taxpayer; mechanical centering on income and expense figures is to be avoided.” Paper Mill Playhouse, supra, 95 N.J. at 521, 472 A.2d 517. While N.J.S.A. 54:4-3.6 requires that the operation and use of property not be conducted for profit, “[t]here is nothing in the statute requiring, as a condition of tax exemption, that a [hospital] must actually operate at a loss____” Id. at 522, 472 A.2d 517 (quoting Trenton v. N.J. Div. of Tax Appeals, 65 N.J.Super. 1, 10, 166 A.2d 777 (App.Div.1960)). “A crucial factor is where the profit goes____ ‘[I]f [the court] can trace it into someone’s personal pocket [the hospital] [will] not be entitled to tax exemption.’ ” Ibid. (quoting Trenton, supra, 65 N.J.Super. at 12, 166 A.2d 777).
[AHS Hosp. Corp., supra, 25 N.J.Tax at 381-83.]
B. Kimberly School v. Montclair
The Hospital relies inordinately on the holding in Kimberley School v. Montclair, 2 N.J. 28, 65 A.2d 500 (1949) as authority for its exemption claim here arguing that the test for exemption looks to the dominant motive of the organization claiming exemption. *497 While Kimberley School remains good law, it is clearly not the standard by which contemporary courts must determine whether the Hospital qualifies for property tax exemption under N.J.S.A. 54:4-3.6.
Kimberly School was a private school in Montclair founded in 1906 with a total enrollment of 230 students. Its board of trustees served without compensation. Total income amounted to $60,323.94 and expenditures totaled $57,522.86, leaving a surplus of $2,801.08. The largest expenditure was for teaching salaries, which the Court noted were “very modest.” Of the twenty-seven or so teachers, only three earned salaries exceeding $2,000. Tuition ranged from $150 to $450 for the upper grades, which were “average for comparable schools in the area.” Id. at 31-32, 65 A.2d 500.
The Division of Tax Appeals denied exemption on the basis that the school was not “fundamentally charitable or philanthropic.” Montclair v. Kimberly School, 25 N.J. Misc. 165, 169, 51 A.2d 228 (1947). At that time, New Jersey courts interpreted the property tax exemption statute, N.J.S.A. 54:4-3.6, to require an educational institution claiming exemption to be “fundamentally charitable or philanthropic” in its “purposes and objects.”[44] Id. at 165, 51 A.2d 228.
In Kimberley School, the New Jersey Supreme Court abandoned this test and reversed the denial of tax exemption finding that there was no such requirement contained in the plain language of the statute. “The consistent and repeated scheme of separate legislative treatment of tax exemption for educational institutions in successive legislative enactments for nearly a century would seem to negate completely any possible basis for applying the charitable, benevolent and religious criterion to educational institutions____” Id. at 37, 65 A.2d 500.
*498 The Court then turned its attention to whether Kimberly School was conducted for profit. It listed several factors to be considered when making this determination including: “the many other factors bearing upon the ascertainment of the dominant motive in the conduct of the school ...” Id. at 38, 65 A.2d 500 (emphasis added).
When applying these factors, the Court found that “it is not enough that a profit should be made. The school must be conducted for the puipose of making a profit: i.e., as a commercial enterprise, in order to be deprived of its exemption.” Id. at 40-41, 65 A.2d 500. The Court further recognized “it is not essential that a school habitually function at a loss in order to enjoy exemption from taxation.” Id. at 44, 65 A.2d 500. The Court concluded that Kimberly School was not being conducted for profit — “it can hardly be said that profit was the dominating object” of the owners. Id. at 43, 65 A.2d 500 (emphasis added). The Court cited the modest salaries paid to the teachers and the meager accumulated surplus of only $11,615.75 after 35 years of operation, stating that the small surplus “tells its own story.”[45] Ibid.
C. Post Kimberly School Decisions
Since 1949, Kimberley School has been cited twenty-six times in subsequent court opinions (including the present opinion) — twenty-five times by New Jersey courts and once by the Arizona Supreme Court. New of these cases provide any substantive discussion of Kimberley School, and even fewer cases make any mention of the factor test enumerated in Kimberley School. Assuming, arguendo, that Kimberley School was ever controlling with regard to any claimed property exemption (even for schools), its relevance has been diminished by subsequent case law, particularly following the 2011 New Jersey Supreme Court decision in *499 International Schools Services, Inc. v. West Windsor Twp., 207 N.J. 3, 21 A.3d 1166 (2011). There, the Court clearly held that tax exemption cases, including Kimberley School, are necessarily limited to their facts and are not controlling. International Schools, supra, 207 N.J. at 22, 21 A.3d 1166. The Court also stated that the statutory test as set forth in Paper Mill is “the standard” for determining whether an organization qualifies for exemption. International Schools, supra, 207 N.J. at 16, 21 A.3d 1166.
The following additional cases reference Kimberley School in some fashion, and thereby further illustrate where that case stands in relation to contemporary property tax exemption determination: Trenton, supra, 65 N.J.Super. at 11, 166 A.2d 777 (finding that “no evidence of a profit motive or profit-making enuring to the benefit of any individual or group of individuals, or of the institution itself.”); Pingry Corp. v. Hillside, 86 N.J.Super. 437, 442, 207 A.2d 194 (App.Div.1965) (where the Court made no citation to Kimberley School, even though the Appellate Court expressly stated that it found Kimberley School to be controlling.); City of New Brunswick v. George Street Playhouse, Inc., 2 N.J.Tax 407, 414 (Tax 1981) (where the Tax Court found “no evidence of a dominant profit motive”, and therefore, plaintiff failed to demonstrate the Playhouse had a “money-making objective.”); Paper Mill Playhouse, supra, 95 N.J. at 521-522, 472 A.2d 517, (While the Supreme Court cited Kimberley School two times under its profit test analysis, there was no mention of the Kimberley School factors, or the dominant motive or dominant object language.); and, N.J. Carpenters Apprentice Training & Educ. Fund v. Bor. of Kenilworth, 147 N.J. 171, 189, 685 A.2d 1309 (1996) (the Supreme Court cited the multi-factor test enumerated in Kimberley School, and denied the exemption because the fund was not a school and “operated primarily to benefit a particular profit-making sector of the economy.”).
While Kimberley School likely marks the beginning of our courts’ modern analysis of the property exemption, the Hospital’s undue reliance on Kimberley School here is clearly misplaced. The court is satisfied that the cases following Kimberley School do not support the Hospital’s contention that the test for exemption *500 looks to the dominant motive of the organization claiming exemption. If anything, the exemption considerations addressed by the Court in Kimberley School have been incorporated into the three-prong test of Paper Mill Playhouse, which is now the standard. Clearly there is more recent, more relevant, and more authoritative case law since Kimberley School.
VII. The Hospital’s Relationship with Private, For-Profit Physicians.
An organization claiming exemption is permitted to have both exempt and non-exempt uses occurring on its property “so long as the two purposes can be separately stated and accounted for and so long as the non-exempt use is never subject to the property tax exemption.” International Schools, supra, 207 N.J. at 23, 21 A.3d 1166. Accordingly, for-profit activities carried out on tax-exempt property must be “conducted so as to be evident, readily ascertainable, and separately accountable for taxing purposes.” Id. at 23, 21 A.3d 1166.
On the other hand, exemption will be denied where there is significant and substantial “comingling of effort and entanglement of activities and operations” on the property. Id. at 25, 21 A.3d 1166. Exemption is properly denied when the court is unable to discern between non-profit activity and “activities in the same location that [are] in furtherance of the interests of various for-profit entities.” Id. at 24, 21 A.3d 1166. It does not matter whether the for-profit entities are related or unrelated to the organization claiming exemption. See International Schools, supra, 207 N.J. at 24, 21 A.3d 1166 (exemption denied where the benefit flowed to both related and unrelated for-profit entities).
Because the burden is on the claimant to prove it satisfies the criteria for exemption, the New Jersey Supreme Court has held that “the claimant has the corollary duty to conduct its affairs in such a fashion as to allow local taxing authorities to readily determine its eligibility for exemption.” Id. at 24, 21 A.3d 1166. The court must be able to distinguish where non-profit activity ends and for-profit activity begins,
*501 Otherwise, to permit a nonprofit entity to claim a property tax exemption when it has become inseparably entangled with for-profit entities would allow indirect taxpayer subsidization of those entities. In other words, a competitive advantage would be conferred on those for-profit entities at the expense of the taxpaying public.” The advantage would accrue to the monetary gain of the stockholders and owners of the for-profit entity, and would result in the type of disquieting outcome cautioned against in Paper Mill Playhouse, supra, in which we warned that an exemption should not be granted when profit can be traced into ‘someone else’s personal pocket.’
[International Schools, supra, 207 N.J. at 23-24, 21 A.3d 1166.]
Here, the court is unable to discern between the nonprofit activities carried out by the Hospital on the Subject Property, and the for-profit activities carried out by private physicians. Accordingly, the Hospital’s application for tax exemption must be denied.
Of the three types of physicians that provide care at the subject property, voluntary physicians and exclusive contract physicians (i.e. RAP doctors) are private, for-profit doctors that are not employed by the Atlantic healthcare system.
These physicians operate on a for-profit basis and are therefore subject to taxation. Accordingly, the court must be able to determine where these physicians practice on the Subject Property in order to identify the areas of the Hospital that are subject to taxation. Likewise, the court must be able to determine where these physicians do not practice on the Subject Property in order to identify the areas of the Hospital where exemption may be preserved.
Such a delineation is not possible in this case. During cross-examination, Dr. Conroy went through the floor-plans of the Subject Property, floor by floor, and marked with a highlighter where the numerous physicians practiced (and by implication, where they did not practice). It became clear that employed physicians, voluntary physicians, and RAP doctors were not contained within any particular area of the Subject Property. In fact, they all worked throughout the Subject Property without limitation or restriction.
In response to the question “when [doctors] come physically on the property, whether they’re voluntary, employed, or RAP doc *502 tors, are they restricted in any way that they can’t go into a particular area or they’re — they’re barred from leaving an area, that sort of thing?” Dr. Conroy responded that “Physicians actually are allowed anywhere in the hospital ... they do their work everywhere,” furthermore, she stated “any physician in the hospital if requested could deliver services in the facility” (emphasis added).
The voluntary physicians and RAP doctors not only operate throughout the Hospital, but they use the Hospital facility to generate private medical bills to patients. These bills are charged directly by the private physicians to the patients, and all the money goes directly to the physicians.[46]
The court finds that the for-profit voluntary physicians and RAP doctors cannot “be separately stated and accounted for” and, therefore, the Hospital’s arrangement with them directly violates the requirement articulated in International Schools. International Schools, supra, 207 N.J. at 23, 21 A.3d 1166. The operation of the voluntary physicians and RAP doctors on the Subject Property is not “evident, readily ascertainable, and separately accountable for taxing purposes.” Id. at 23, 21 A.3d 1166. Because the court is substantially unable to discern where non-profit activity occurs, and where for-profit activity occurs, the court could only identify three areas of the Subject Property where the property tax exemption may be preserved. See discussion infra in Sections XI A and XIII.
The Hospital contends that, since
[T]he Legislature [in amending N.J.S.A. 54:4-3.6] removed ‘exclusively’ from the Use test, and added language providing for partial disqualification when an improper use was made of a portion of an otherwise tax-exempt property!,] ... [it] added an element to the Use test which considered whether a portion of the subject property was being used for a non-exempt purpose ... The portion so used would *503 fail the Use Test without jeopardizing the qualification of the balance of the property.
The Hospital proffers a conjured interpretation of the amendment to N.J.S.A. 54:4-3.6 to conflate the use test and profit test into one test, which it terms the “Use (For Profit) Test.” Nowhere in the legal lexicon of property tax exemption law can there be found the phrase “Use (For Profit) Test.” This wholly manufactured term is proffered by the Hospital for the first time in this matter, and is not contained in the plain language of N.J.S.A. 54:4-3.6, nor in any of the ease law cited by the Hospital. While the Supreme Court concluded in International Schools that, “In our view, prong two [use] and prong three [profit] must be addressed in tandem,” International Schools, supra, 207 N.J. at 17, 21 A.3d 1166, it never coined the phrase “Use (For Profit) Test,” nor did it alleviate the requirement that both the use and profit prongs had to be satisfied simply because they “must be addressed in tandem.” Id.
Moreover, the Hospital makes no reference to this International Schools language as either support for, or the source of, the term “Use (For Profit) Test.” Instead, the Hospital points to Princeton University Press as what it claims to be “The first example of the Use (For Profit) Test.” That case, however, was more than twenty years before the amendment to N.J.S.A. 54:4-3.6. It is not clear to the court what the Hospital even means when it uses the term “Use (For Profit) Test”; the Hospital has failed to provide any meaningful guidance in that regard. The court is satisfied that the term “Use (For Profit) Test” has no meaning and no significance to the determination to be made here.
The Hospital further argues (citing Hunterdon Med. Ctr., supra, 195 N.J. at 572, 951 A.2d 931) that “the burden of proof shifts to the municipality when the non-profit hospital demonstrates that uses occurring on its main campus property are for the ‘hospital purpose’ of providing medical services.” Emphasis added.[47] This *504 court is not convinced that Hunterdon Medical Center shifts any aspect of a property tax exemption determination to the municipality under the most generous of interpretations. Moreover, the Supreme Court has more recently re-affirmed that the burden is on the claimant to prove it qualifies for tax exemption. International Schools, supra, 207 N.J. at 24, 21 A.3d 1166.
Assuming arguendo, that the referenced section of Hunterdon Medical Center somehow can be construed to support the Hospital’s burden shifting argument, the Court specifically limited any presumption to the use “for core ‘hospital purposes,’ ” and did not relieve the claimant of the obligation to also satisfy the profit test. The presumption that “the property should be deemed tax-exempt eligible under the actual-use requirement of N.J.S.A. 54:4-3.6,” Id. at 572, 951 A.2d 931 (emphasis added), according to the Court, would only stand “assuming there is no other reason disqualifying the property’s use from tax-exempt eligibility.” Id., emphasis added. Clearly the failure of the Subject Property to qualify under the profit test would be some other reason to deem it ineligible for tax exemption, even if the use test is satisfied.
It still remains that each prong, of the three-prong test for determining eligibility for property tax exemption under N.J.S.A. 54:4-3.6 set forth in Paper Mill Playhouse, must be satisfied to qualify for exemption. Failure to comply with any one prong of the test precludes exemption.
*505 Finally, the Hospital re-asserts a failed argument it raised in this matter during a previous proceeding, which is now incorporated herein from the court’s opinion-letter of September 29, 2010, namely: “[T]he proper inquiry under the Third Prong is on the profitability of the tax-exempt entity that owns the property in question, rather than the profit generated by the use and operation of the property.” Id. In other words, this court should ignore the fees generated and retained by the for-profit voluntary physicians and RAP doctors on site because the Hospital does not profit from the for-profit doctors’ use and operation of the Subject Property.
The illogic of such an argument is dumbfounding. Clearly, the voluntary physicians and RAP doctors serve a legitimate hospital purpose, but the inquiry does not end there. The determination here is the same as our courts have determined before, “[t]he use-for-an-exempt-purpose [prong] is superfluous when property is otherwise ineligible because a for-profit activity is conducted on it ...” Riverview Org. Inc. v. Phillipsburg, 26 N.J.Tax 167, 178 (Tax 2011) (citing Hunterdon Med. Ctr., supra, 195 N.J. at 566, 951 A.2d 931). Clearly it is not just “the profitability of the tax-exempt entity that owns the property” at issue here, but rather it’s also the doctors’ “for-profit activity ... conducted on it.” See also Trenton, 65 N.J.Super. at 11, 166 A.2d 777 (finding that “no evidence of a profit motive or profit-making enuring to the benefit of any individual or group of individuals, or of the institution itself.”) (emphasis added)).
Although the Hospital maintains that hospitals are sui generis and should therefore be afforded special treatment under the statute, the Hospital offered no support for this position, and it is accordingly rejected by the court.
While there has been little testimony into the operations of New Jersey for-profit hospitals in this matter, assuming that for-profit hospitals have the same kinds of arrangements with for-profit doctors[48] as here, the for-profit hospitals pay property taxes; *506 under the Hospital’s position, non-profit hospitals would and should be exempt. In essence, the Hospital is asking the court to embrace an interpretation of N.J.S.A. 54:4-3.6 that would result in an inequitable advantage to non-profit hospitals over for-profit hospitals.
This court denied property tax exemption under N.J.S.A. 54:4-3.6 in Riverview, supra, 26 N.J.Tax at 182, finding that “[t]he Art Center’s activities at the Subject Property support profitable activities of separate for-profit entities.” Id. (emphasis added), aff'd, Phillipsburg Riverview Org. v. Town, 27 N.J.Tax 188, 195 (App.Div.2013) (emphasis added) (finding “plaintiff failed to prove that the various dancers, artists, and teachers did not use the facility to earn a profit.”) It was of no consequence that the Phillipsburg Riverview Organization itself, was not profiting from the activities of “that the various dancers, artists, and teachers” on its property.[49] No distinction need be made in the present matter.
VIII. Affiliated and Non-Affiliated For-Profit Entities
In order to satisfy the profit test, an entity claiming exemption must demonstrate that the operation and use of its property is not conducted for profit. Paper Mill Playhouse, N.J.S.A. 54:4-3.6. When determining whether the operation and use of a property is conducted for profit, the court must consider not only benefits flowing to the entity claiming exemption, but also benefits flowing to related and unrelated for-profit entities.
For example, in International Schools, exemption was denied where the activities and operations on the property were conducted for the benefit of related and unrelated for-profit entities. Even though the entity claiming exemption did not violate the profit test itself, the Court nonetheless ruled that the property *507 failed the profit test because the operation and use of the property was conducted for the benefit of other entities, namely for-profit ones. Consequently, exemption was denied.
The Supreme Court affirmed the Appellate Division’s ruling as to the third prong, recognizing that both the Tax Court and Appellate Division agreed:
ISS had conducted itself in a manner that entangled its activities and operations on its property with the advancement of for-profit activities of other related and unrelated for-profit entities. That commingling of effort and entanglement of activities and operations by ISS and its for-profit affiliates was ... significant and it all flowed to the benefit of the for-profit entities.
[International Schools, supra, 207 N.J. at 5-6, 21 A.3d 1166.]
Here, the Hospital maintained relationships with a number of affiliated and non-affiliated[50] for-profit entities. This included the following organizations: physician practices (captive P.C.’s) owned by the Hospital; Atlantic Health Management Corp., a subsidiary of Atlantic that owned a number of other for-profit subsidiaries affiliated with the Atlantic healthcare system; AHS Insurance Co., Ltd., a subsidiary of Atlantic; and other unrelated for profit entities.
A. Captive P.C.’s
The Hospital owned 100% of the stock in five for-profit private physician practices (listed in Appendix A) referred to as “captive P.C.’s.” After being purchased by the Hospital, these practices remained for-profit entities with a single shareholder who held that share of stock in trust on behalf of the Hospital.[51] In each instance that sole shareholder was Dr. Conroy.
All the employees of these private practices, including the doctors, were employed by the Hospital. Practice Associates *508 Medical Group, P.C. was a non-profit subsidiary of AHS that served as a billing company for the captive P.C. physicians employed by the Hospital. The Hospital was also responsible for all income and expenses of these practices. All of the practices generated losses, often in the millions of dollars, although there was testimony of one instance of a profitable year. Further, the Hospital loaned millions of dollars to these entities. When asked why the Hospital was lending so much money to these practices, Mr. Lenahan testified that the Hospital subsidized these losses in order to “meet the needs of the community.” In short, the Hospital transferred money from the profitable areas of the Hospital and subsidized these physician practices that consistently lost money.
The loans provided by the Hospital to these physician practices were termed “working capital” or sometimes just “capital” loans. Other types of loans, called “recruitment loans,” were given directly to private physicians to help them transition their practice into the local community. These loans were subject to forgiveness after a certain period of time, at which point it would become declared income of the physician. During trial the Hospital elicited testimony regarding the financial statements concerning the Hospital-owned physician practices. At times, the testimony was strained to provide an explanation as to where the money went. What is clear is that these physician practices did not have their own accounting departments; all their financials were processed by the Hospital.
B. Affiliated For-Profit Entities
The Hospital also maintained a relationship with Atlantic Health Management Corp., a subsidiary of Atlantic that owned a number of other affiliated for-profit entities (listed in Appendix A). During the years in question, Kevin Shanley was the Vice President of Finance and Chief Financial Officer for both Atlantic and the Hospital, which operated as non-profit entities. However, Mr. Shanley also served as a statutory officer for ten other affiliated for-profit subsidiaries of the Atlantic healthcare system. While serving in these dual roles, Mr. Shanley often found himself as an executive board member of both entities engaged in a financial *509 transaction. For instance, sometimes Mr. Shanley would be an executive of both the lending entity and the borrowing entity. Mr. Shanley, however, did not have unilateral authority over these kind of transactions.
Like other board members that served in executive roles on both the non-profit and for-profit branches of Atlantic, Mr. Shan-ley was only compensated for his work done at the Hospital and for Atlantic generally; he was not compensated for his time serving as a statutory officer for some of the for-profits. His “minimal” role as statutory officer in these for-profit entities was limited to attending four quarterly board meetings.[52]
The assets of Atlantic Health Management Corp. and its subsidiaries were in excess of $50 million dollars. This represented approximately 3.6% of the total assets before eliminations of Atlantic, which were in excess of $1 billion. Atlantic Health Management represented approximately 1.3% of the net assets of Atlantic.
The total revenue of Management Corp. and its subsidiaries was in excess of $30 million (i.e. approximately 3% of Atlantic’s $1 billion plus total revenue before eliminations), a figure Mr. Lena-han termed “insignificant in comparison to the whole Atlantic Health System, Inc.” (emphasis added).
Further, for accounting purposes, separate audits were conducted for the non-profit and for-profit branches of Atlantic. According to Mr. Lenahan, Management Corp. and its subsidiaries were “insubstantial” and “immaterial,” as it represented less than 5% of the whole Atlantic healthcare system. Consequently, separate audits were ordered for Management Corp. and its subsidiaries, not only to preserve independence, but also to make sure nothing *510 was “skipped” due to the relatively small size of Management Corp. and its subsidiaries compared to the system as a whole.
Generally, Management Corp. and its affiliates maintained separate employees from the Hospital, with the exception of Morris-town Surgical Center at Madison Ave, LLC, which was staffed by Hospital employees. Financial records revealed a $2.6 million transfer from the Hospital to Management Corp. to cover expenses for the Hospital employees that worked at Morristown Surgical. Other than Morristown Surgical, no Hospital employees were employed at the other for-profit subsidiaries of Atlantic Health Management.
The Hospital also issued a capital loan in the amount of $550,000 to Morristown Surgical for the purchase of certain equipment. No interest rate was indicated.
The Hospital also issued loans to other subsidiaries of Atlantic Health Management, Corp., in addition to Morristown Surgical. For example, the Hospital issued a loan in the amount of $370,000 to AHS Investment Corp. for the purchase of equipment. The Hospital again issued a loan in the amount of $220,000 to AHS Investment Corp. for the purchase of equipment, for which the Hospital charged a service fee. The terms of the loan as provided by the financial records introduced at court indicated “repay principle only.” Another loan was made to AHS Investment Corp. on the same terms in the amount of $320,000.
C. AHS Insurance Co., Ltd.
Throughout trial, one of the relationships most scrutinized by Morristown was the Hospital’s relationship with AHS Insurance, a for-profit subsidiary of Atlantic, organized under the laws of the Cayman Islands as a self-insurance trust fund to insure the Hospital against professional and general liability. AHS insurance is a “single-parent, captive” insurance company, which means it can’t sell insurance commercially. Rather, it can only provide coverage to Atlantic and its non-profit and for-profit subsidiaries. The Hospital paid all insurance premiums and expenses for the Atlantic subsidiaries, both non-profit and for-profit. To the extent *511 it paid insurance for the for-profits, those costs were charged back to the for-profits.
Mr. Sepaniak served as the president of AHS Insurance, and was responsible for the general oversight and operations. Mr. Sepaniak was also the Vice President and General Counsel for Atlantic and the Hospital. He was only compensated for his time at Atlantic and the Hospital; he was not compensated for his role at AHS Insurance.
As president of AHS Insurance, Mr. Sepaniak reviewed and signed all the policy documents of AHS Insurance. He was further responsible for the hiring of all professionals of AHS Insurance. Mr. Sepaniak, however, was unable to testify whether AHS Insurance had hired any financial advisors. He did not review any audit reports on AHS Insurance. He did not know if the Hospital reviewed those audits. He did not recall being interviewed by any auditors. He was not involved in determining the premium amounts paid to AHS Insurance.
Both Mr. Sepaniak and Kevin Shanley served on the board of AHS Insurance, as well as the executive board of Atlantic and a number of Atlantic’s for-profit and non-profit subsidiaries. Mr. Sepaniak, however, could not recall whether any board members of AHS Insurance or other Atlantic subsidiaries were also involved in the Hospital’s risk department.[53]
AHS Insurance did not process claims made against any of the insured. Mr. Sepaniak described AHS Insurance as being merely a “bank account.” When a claim was filed against one of the insured entities covered by AHS Insurance, the claim and risk determination was processed by a risk and insurance department in the Hospital. Mr. Sepaniak was also in charge of that risk department at the Hospital that handled the claims and made all *512 determinations as to amounts paid out of AHS Insurance. The risk department employees were all employed by the Hospital.
When a claim was filed against the Hospital or against any insured Atlantic subsidiary, whether non-profit or for-profit, that claim would be processed by the risk and insurance department the Hospital. Routinely, outside counsel would be hired to manage that claim. However, all business decisions and settlement authority resided within the risk department. Once resolved, the claim would be paid out of AHS Insurance.
The Hospital paid the expenses for AHS Insurance. When it came time for AHS Insurance to reimburse the Hospital for those expenses, the Hospital sent a bill to Atlantic Health Investment Corp., the parent company of AHS Insurance. Atlantic Health Investment Corp. would then bill AHS Insurance, and then, as Mr. Lenahan put it, “then it comes back the other way.” These expenses totaled $6.4 million.
Separate from the payment for expenses, the Hospital also transferred $6.3 million to AHS Insurance related to the premium for that year.
AHS Insurance had a $10 million line of credit issued by JP Morgan, which was guaranteed by the Hospital.
The Hospital also made two capital injections in the amount of $6 million, for a total of $12 million, into AHS Insurance in 2009 and 2010. These capital injections were made to cover stock market losses and large insurance claim payouts. While these capital injections occurred outside the relevant time period, there was testimony to support that the injections covered losses taking place in 2007 or 2008, specifically relating to the stock market crash at the time.
D. Non-Affiliated For-Proñt Entities
The Hospital also provided loans to non-affiliated, for-profit entities, in addition to the Hospital-related entities. For example, the Hospital issued a loan in the amount of $200,000 to Affiliated Physicians MEWA trust, a for-profit entity unrelated to the Hospital or Atlantic, which provided health insurance to physician *513 practices. The financial records introduced at trial did not reflect an interest rate on the loan.
The Hospital also issued a working capital loan in the amount of $500,000 to Associates in Rehab Medicine, another unrelated for-profit entity. The financial records show that payment was applied against principle and interest. A working capital loan in the amount of $203,000 was made to a physician practice called Morristown Medical Group, another unrelated entity. Again, no interest rate was indicated in the financial records.
E. Analysis
The court finds that the Hospital operated and used its property for a profit-making purpose, thereby violating the profit test as set forth in Paper Mill Playhouse and as applied under International Schools. By entangling its activities and operations with those of for-profit entities, the Hospital allowed its property to be used for profit. This commingling of effort and activities with for-profit entities was significant, and a substantial benefit was conferred upon for-profit entities as a result. Accordingly, the Hospital failed to satisfy the profit test as set forth in Paper Mill Playhouse, and is precluded from exemption.
The Hospital provided substantial subsidies to various related and unrelated for-profits in the form of working capital loans, capital loans, and recruitment loans. With respect to the captive P.C.’s, these physician groups routinely operated at a loss and money from profitable departments at the Hospital was transferred to these “loss leaders” to subsidize them. Moreover, Hospital employees worked at these practices, which continued to operate as for-profit entities.
Furthermore, Dr. Conroy served as the President and sole shareholder of each of these practices, and as the Vice President of Atlantic and President of the Hospital. The court finds it impossible for an arms-length transaction to occur under such circumstances. The court is satisfied that the Hospital’s arrangement with its captive P.C.’s violates the profit test as applied in International Schools.
*514 With respect to the Hospital’s relationship with Atlantic Health Management Corp. and its subsidiaries, the court finds that the Hospital conferred a substantial pecuniary benefit in the form of working capital and other loans to these entities. Mr. Shanley, who served as the Vice President of Finance and Chief Financial Officer for Atlantic and the Hospital, often served on the executive boards of both the lending and borrowing entities in these transactions. Despite Mr. Shanley’s “minimal” role in these entities, the court is not persuaded that an arms-length transaction could occur under such circumstances.
The court also finds that the Hospital has entangled its activities and commingled its efforts with AHS Insurance in violation of the profit test. The Hospital loaned millions of dollars to AHS Insurance, paid millions in expenses, and guaranteed a line of credit in the amount of $10 million dollars. Even assuming that all the various financial transactions enumerated above were properly “charged back,” as was asserted at trial, the court nonetheless concludes that there is no meaningful separation between the for-profit and non-profit subsidiaries of Atlantic. In short, the Hospital called all the shots.
Finally, although there is limited information in the record regarding the relationship between the Hospital and unrelated, for-profit entities, the court is satisfied that the loans issued to those entities by the Hospital provide further evidence of the Hospital’s “comingling of effort and entanglement of activities” to advance for-profit endeavors. International Schools, supra, 207 N.J. at 3, 21 A.3d 1166.
Accordingly, the court finds that the operation and use of the subject property was conducted for a for-profit purpose, and advanced the activities of for-profit entities. By entangling and commingling its activities with for-profit entities, the Hospital allowed its property to be used for forbidden for-profit activities. The Hospital, therefore, fails to satisfy the profit test, and is thus precluded from exemption.
*515 EX. Executive Salaries
As part of their compensation, the hospital provided its executives with a benefit plan that included an automobile stipend, a cell phone plan, and a golf club membership. The executives received an incentive compensation based off their base salary and some of the executives received bonuses as part of their compensation. The parties agreed to limit the evaluation of executive salaries to the following four individuals:
Joseph Trunfio, President and Chief Executive Officer of Atlantic Health System, received a total compensation of $5,034,313 in 2005. This included a base salary of $953,846, a bonus of $348,000, and a total benefit plan of $3,416,123. The benefit plan included medical, dental, and disability insurance as well as a pension contribution. In 2006, he received a total compensation of $1,574,023. This included a $1,010,011 base salary, a $357,500 bonus (including a deferred bonus of $88,000 from 2005), and a 457 plan contribution of $188,549. In 2007, he received a total compensation of $5,978,816. He was paid a base salary of $1,077,361, a bonus of $556,800, a benefit plan of $446,245, and a severance package of $3,123,744.
In 2007, Andrew Kovach, Vice President of Human Resources and Chief Administrative Officer (CAO), received $715,174 in compensation plus an additional $792,909 contribution to an employee benefit plan. The same document shows that Mr. Sepaniak received $708,047 in compensation and a $776,919 contribution to an employee benefit plan in 2007.
Dr. Conroy, according to her own testimony, received base salaries of $575,515 in 2005, $589,118 in 2006, and $688,044 in 2007. She was unable to confirm the amount of her deferred compensation in any those years but a documentary evidence indicates that she received a $916,381 contribution to her employee benefit plan in 2007.[54]
*516 The New Jersey Supreme Court has long held that a tax-exempt organization is permitted to pay salaries to its staff as long as those salaries are not excessive.[55] Kimberley, supra, 2 N.J. at 38, 65 A.2d 500 (1949); Trenton, supra, 65 N.J.Super. at 12, 166 A.2d 777. When determining whether a salary is excessive for the purpose of satisfying the profit test, New Jersey courts compare the salaries at issue to other salaries paid for similar positions at similar institutions.
In Kimberley, the Court enumerated several factors that should be considered when determining whether a school was being conducted for profit, including the scale of salaries paid to the teachers. The Court stated that salaries should be “compared” with “similar schools, both public and private.” International Schools, supra, 207 N.J. at 21, 21 A.3d 1166 (citing Kimberley, supra, 2 N.J. at 38, 65 A.2d 500). Because the teachers were paid “modest” salaries of less than $2,000 per year in 1943, the Court concluded that the teacher salaries were not excessive.
Similarly, the Appellate Division in Trenton reviewed whether the faculty salaries at Rider College (now Rider University) satisfied the profit test under N.J.S.A. 54:4-3.6. The court determined that the faculty salaries “are on a par with schools of comparable size and standing.” Trenton, supra, 65 N.J.Super. at *517 8, 166 A.2d 777 (emphasis added). The court further made the following remarks:
They receive straight salaries, not affected by the number of students enrolled. They visit high schools and aid in screening the candidates for admission to the college. They participate in high school “career” programs. Their services are of the same character as those of similar officials employed by most first-rate colleges.
[Trenton, supra, 65 N.J.Super. at 9, 166 A.2d 777 (emphasis added).]
The court determined that “no individual can obtain anything more than just compensation for services,” and accordingly granted tax-exempt status to Rider College.
In International Schools, the Court applied the same analysis to a non-profit organization whose mission was to aid, promote, and encourage educational associations abroad. The Court described the executive compensation and staff salaries as follows:
Compensation is limited by the Certificate of Incorporation to reasonable salaries for services actually performed. ISS’s president, John Nicklas, has received a salary in accordance with the findings of a compensation survey that assessed the salaries of chief executive officers of similarly-sized nonprofits in New Jersey. Superintendents and other staff members of ISS also received salaries determined by way of comparison to those engaged in similar positions in similar locales.
[International Schools, supra, 207 N.J. at 9, 21 A.3d 1166 (emphasis added).]
Reviewing this salary arrangement, the Court concluded that there was no evidence of excessive salaries.[56]
The aforementioned cases demonstrate that, when determining whether a salary is excessive for the purposes of satisfying the profit test, New Jersey courts should consider whether the salary is comparable with other salaries paid by similar institutions. This requires the court to consider the following factors: (1) the nature of the institution (i.e., for-profit or non-profit, private or public), (2) the size of the institution, (3) the location of the institution, and (4) the position for which the salary is paid and the work being performed. See Kimberley, supra, 2 N.J. 28, 65 *518 A.2d 500; Trenton, supra, 65 N.J.Super. 1, 166 A.2d 777; International Schools, supra, 207 N.J. 3, 21 A.3d 1166.[57]
A salary is not excessive when it is comparable to other salaries paid for similar positions by similar institutions. However, when salaries are substantially higher than those paid by similar institutions, or the claimant fails to provide evidence of salaries paid for similar positions by similar institutions, then the court will rule that the salary in question does not satisfy the profit test.
In the present matter, the Hospital failed to meet its burden to establish the reasonableness of the compensation paid to its executives. Furthermore, the hospital failed to convince the court that the standard applicable to the IRS[58] should be adopted *519 in New Jersey.[59] As with much of the Hospital’s case, the failure here is one of proof.
Dr. David A. Bjork was qualified and accepted as an expert in executive compensation and testified as a witness for the Hospital. He prepared an expert report that was admitted into evidence without objection.
The court viewed the expert’s analysis here much the same as it would in any property tax appeal where an appraisal expert utilized sales and/or leases of comparable properties. In a tax appeal, the particulars of the deal that resulted in a sale or lease claimed to be comparable would have to be scrutinized, and if necessary, adjusted to account for differences between the subject property and those claimed to be comparable. The inquiry should be no different when comparing what one hospital salary committee concluded as compared to another.
Here the expert established a “peer group of other comparable [hospital] systems in the greater New York metropolitan region,” generally hospitals similar in size, geographic location, purpose, revenue generation, etc. While he concluded that the AHS Compensation Committee followed “best practices and met the requirements for the presumption of reasonableness set forth by the *520 IRS,” he failed to show that the hospitals he chose for the peer group in fact did the same thing.[60]
This is similar to why comparing assessments of different properties in a property tax appeal is disallowed — the other assessment may be incorrect. Rothman v. City of Hackensack., 1 N.J.Tax 438, 441 (Tax 1980), aff'd sub nom, 4 N.J.Tax 529 (App.Div.1981) (citing Greenwald v. Borough of Metuchen, 1 N.J.Tax 228, 236 (Tax 1980)) (“[P]roof of comparative assessments is inadequate to sustain a claim of discrimination”).
Here, whether the compensation committees of the peer group hospitals followed the same rigorous procedure the expert outlined for the AHS Compensation Committee is not in evidence. The expert took the salary conclusions of his chosen peer group hospitals, to determine what reasonable salaries should be at the Hospital; clearly a net opinion unsupported by any meaningful comparison, deal to deal, process to process. If the only consideration is what similar hospitals set as salaries, then the salaries would always be reasonable; a conclusion wholly self-serving to all non-profit hospitals.
The expert further concludes that the AHS Compensation Committee consisted of “well-respected members of the Board [of Directors], sophisticated business executives and professions, who understand AHS, the healthcare industry, the rules pertaining to executive compensation in the tax-exempt sector ... [and] for the years in question was a uniquely qualified group, with unusually sophisticated members.” The record, however, is devoid of any evidence concerning the background or specific expertise of any member of the AHS Compensation Committee that would support the claims and conclusions of the expert in this regard.[61]
*521 According to the expert, in selecting the greater New York metropolitan area as “the best peer group in setting compensation at AHS,” given its size and complexity, “the [compensation] committee recognized that AHS is located within the greater New York metropolitan area and has to compete for talent with organizations in Manhattan, the rest of New York City, and its suburbs in New Jersey, New York and Connecticut.”[62] Here again, these conclusions are unsupported by any evidence, testimony or reliable data for the court to evaluate.
According to the expert the AHS “Compensation Committee is responsible for reviewing and approving all aspects of executive compensation,” and is charged with the responsibility of “follow[ing] the process for meeting the requirements for the presumption of reasonableness, as defined in IRC § 4958, and to ensure that the compensation does not result in an inurement that would violate state and federal standards.” The testimony is clear that there is no New Jersey standard so the expert’s reference to a state standard is an enigma. The expert proffered that this court follow the IRS standard, and it is clear that the process followed by the AHS Compensation Committee was in furtherance of IRC § 4958.
*522 The IRS standard was intended to apply to various Federal taxes. There are generally no real property taxes under the Federal system; real property taxation is exclusive to State and local jurisdictions. Accordingly, it is unclear to this court why a standard designed for a federal tax system based on income; is at all relevant to a tax exclusive to state and local government based on the true value of real property. The Tax Court has previously held, “Federal income tax exemption standards have no relation to state law governing property tax exemption.” Black United Fund of New Jersey, Inc. v. E. Orange City (Orange Cnty.), 17 N.J.Tax 446, 449 (Tax 1998) (citing Paper Mill Playhouse, supra, 95 N.J. 503, 529, n. 2, 472 A.2d 517 (Clifford and Schreiber, JJ., dissenting)), aff'd sub nom 339 N.J.Super. 462, 772 A.2d 65 (App.Div. 2001), aff'd sub nom. 19 N.J.Tax 480 (App.Div.2001).[63]
Clearly, the expert provided no compelling reason why the court should employ the IRS standard other than it’s generally the only one out there.[64] Even if the IRS standard were somehow applicable to New Jersey, it would seem to this court that it would only apply, by analogy, to taxes similar to those in the federal system for which it was designed. Anything beyond that would require an act of the Legislature in this court’s view.
*523 X. Employed, Physicians’ Contracts.

A. Overview

The vast majority of the medical services at the Hospital were provided by the voluntary physicians or exclusive contract physicians (i.e. RAP doctors). However, there were a small number of physicians employed directly by the Hospital. When the Hospital identified a community need that was unmet by the voluntary physicians or RAP doctors, the Hospital would look outside the community to hire a physician to bring in the needed specialty.
The employed physicians at the Hospital generally practiced in the departments of pediatrics, women’s health, and surgery. The Hospital entered into employment contracts with these physicians, which provided a base salary plus an incentive component to the physician’s compensation. These were based “very methodically on an assessment of the compensation for that specialty in the market area.” The incentive component was calculated based on qualitative factors, such as decreasing ventilator-associated pneumonia or central line infections during a stay at the hospital. The incentive component was also calculated based on quantitative factors, such as the number of patient visits. The physicians were then paid an amount of incentive compensation based on their performance under these factors. The average incentive compensation paid to employed physicians was $32,000.
The physician contracts were created in part by a physician contract committee at the Hospital. The physician contract committee was an internal committee that worked in conjunction with the Hospital’s human resources, finance, and legal departments to create these employment contracts and the incentive provisions. The physician contract committee reviewed a number of national surveys such as Sullivan, Kotter, and MGMA[65] which provided data on physician compensation around the country. Based on this data, the committee would identify pay scales based of *524 comparable Hospitals within a particular market area, called a “peer group.”
There was no contract model that was used for every physician; it was not a “one-size-fits-all” approach. The Hospital aimed to have base compensation for employed physicians at the 60th percentile of the peer group determined through the national surveys. Once incentive compensation[66] was factored in, total compensation was generally in the 75th percentile. Maximum total compensation, however, was capped at the 90th percentile.
Each physician contract varied depending on the time of hire and practice area. However, there was a number of common formats in which the incentive compensation was calculated. In each format, incentive compensation was paid out of a portion of department revenues that was set aside for this purpose, called an “incentive pool.”
In the Department of Pediatrics, the incentive pool was calculated based on total divisional revenue less departmental expenses. Rather than increase a physician’s base salary, the Hospital would instead give the physician a percentage of his or her professional billings, which was paid out of the incentive pool for the department. Although Dr. Conroy testified that physicians’ professional billings were separate from the Hospital revenue, the facts are not clear as to how revenue generated by Hospital employees could ever be separate from the Hospital.
Within the Department of Pediatrics, there were three basic formats in which the incentive component of the physician’s compensation was calculated. One format paid the physician a bonus determined by a percentage of the difference between the department’s patient billing and some predetermined amount. A second format paid the physician a bonus from the net departmental revenues, with the remaining revenue going to the hospital. And *525 a third format paid the physician fifty percent (50%) of his or her own non-ancillary revenues.[67]
In the Department of Women’s Health and OB/GYN, the incentive pool was calculated by the department’s net collected non-ancillary revenues. A portion of these revenues were paid to the physicians, with the remaining portion going to the Hospital.
In the Department of Surgery, the incentive pool was calculated by departmental revenues minus expenses, similar to the Department of Women’s Health and OB/GYN. In one example, a physician’s incentive compensation was calculated based on the number of new patients and the number of surgeries he performed on those patients. The revenue brought in by the increase in surgeries was then split between the hospital and the doctor.
The Hospital entered into employment contracts featuring incentive components with a number of other physicians. There were agreements with two internal medicine physicians, which paid them a fixed amount of incentive compensation after hospital revenues and fees exceeded a particular amount. There was also an agreement with the Medical Director of the Diabetes Center, which paid him fifty percent (50%) of the net collected non-ancillary revenues that he generated above the first $250,000. There was also an agreement with an adolescent psychiatrist, which paid him the first $15,000 of the collected non-ancillary revenues that he generated for inpatient consults.
B. Analysis
A non-profit organization is permitted to pay its employees salaries so long as those salaries are not excessive, and they do not demonstrate a profit-making purpose. Kimberley, supra, 2 N.J. at 38, 65 A.2d 500; Trenton, supra, 65 N.J.Super. at 12, 166 A.2d 777; Jersey Shore, supra, 14 N.J.Tax at 64.
This court has previously found a profit-making purpose in employment agreements where revenues were divided between a *526 hospital and its employed physicians. In Hunterdon Medical Center, physicians in the Pediatric Practice received a specified base compensation as well as short and long term incentive plans under their employment agreements. Hunterdon Med. Ctr. v. Reading Twp., 22 N.J.Tax at 319 (Tax. 2005). The short term incentive plan provided that physicians would receive “actual net revenue” in excess of specified amounts. The long term incentive plan provided that fifty percent of the “Debt Free Net Cash Flow” in excess of specified annual amounts would be added to the base compensation for the physicians. Id. The court found that because the dollar amounts involved in the long term incentive plan could be substantial, a portion of surplus revenues could be traced to “someone’s personal pocket.” Therefore, the court concluded that the Pediatric Practice operated for a profit-making purpose because it shared part of the surplus revenues with the physicians. Accordingly, exemption was denied.
In this case, the court finds that the physician contracts entered into by the Hospital and its employed physicians demonstrates a profit-making purpose, and therefore fails to satisfy the profit test as articulated in Paper Mill Playhouse. The court finds that this revenue-sharing shows that similar to the physician contracts in Hunterdon Medical Center, the employed physicians here were given an incentive component in addition to their base compensation. The incentive pools were derived from departmental expenses and the profit was split between the hospital and the employed physicians, indicating the operation was conducted for a profit-making purpose. Accordingly, the court finds that this incentive provision of the employed physicians’ contracts violates the profit test.
XI. Third-Party Agreements.
Hospitals often engage in contracts with third-parties to provide certain services on the hospital property. In order to satisfy the profit test, a hospital must prove that these contracts are not entered into with a “profit-making purpose.” Jersey Shore, supra, 14 N.J.Tax at 64. For example, in Overlook Hosp. Ass’n. v. Summit, 6 N.J.Tax 90 (Tax 1983), a hospital contracted with a *527 third party to manage its parking garage. The third party’s compensation was limited to a fixed management fee and the hospital bore the expenses of the garage. Based on this arrangement, the court found that the fee was no different than compensation paid to a hospital employee. Moreover, because free parking was offered to employees, which accounted for one-third of the parking garage space, it was “virtually impossible” for the garage to net a profit. The court concluded that the parking garage was not operated to make a profit, either for the hospital or the garage.
Similarly, in Blair Academy v. Blairstown, 95 N.J.Super. 583, 232 A.2d 178 (App.Div.1967), the school hired a catering firm to feed its students and faculty rather than hire employees to work in the kitchen and dining room. The school paid the catering firm a fixed management fee. The Appellate Division affirmed the exemption for the school, finding that the arrangement “cannot be regarded as a commercial activity or business venture of the school.” Blair, supra, 95 N.J. Super, at 590, 232 A.2d 178.
On the other hand, our courts have found that contracts featuring a profit-sharing arrangement violate the profit test. In Jersey Shore, the court found that the hospital’s agreement with a third-party to operate a coffee shop on the premises demonstrated a “profit-making purpose.” The agreement provided for a sixty percent/forty percent (60-40) split of all profits. The court determined that this profit-sharing arrangement demonstrated that the parties contemplated making a profit, and there was also nothing to suggest that making a profit is impossible. Jersey Shore, supra, 14 N.J.Tax at 62. Accordingly, the court ruled the use of the coffee shop was commercial in nature and therefore subject to taxation. Ibid.
In the present case, The Hospital entered into agreements with third-parties to provide a number of support services on the Subject Property. The support services provided by these third-parties pertained to a parking garage and the areas of the Hospital where cafeteria, laundry/linen, and other support services were provided.
*528 This court previously ruled that the Hospital satisfied the organization test, and that the support services provided by these third-parties satisfied the use test articulated in Paper Mill Playhouse. Accordingly, the court need only address whether the contracted support services satisfy the profit test.
A. Gateway Contract
Atlantic entered into a Management Agreement with Gateway Security Systems (“Gateway”), a private for-profit contractor, to provide services related to the Visitors’ Parking Garage located on the Subject Property.[68] The Management Agreement provided that Gateway would be paid a flat management fee payable in twelve monthly installments.
All employees subject to the Management Agreement were employed by Gateway. Gateway was responsible for maintaining employee records, setting wages and benefits, and other terms of employment. The Hospital reimbursed Gateway for employee salaries and other expenses.
The Hospital set forth the schedule of fees and rates charged to patients, visitors, and physicians. All proceeds from the garage would go into a single checking account, called a “sweep” account. Gateway’s fee and other expenses were deducted out of this account. The balance would go to the Hospital.[69] According to the Hospital, the Visitors’ Parking Garage operated at a loss.
The court finds the Management Agreement between the Hospital and Gateway to be substantially the same as the agreement in Overlook Hospital v. Summit. Because the Hospital paid a fixed management fee and the Hospital bore the expenses of *529 operating the parking garage, the Hospital’s fee arrangement with Gateway is no different than compensation paid to Hospital employees. There is also no allegation that the management fee paid to Gateway or the salaries paid to Gateway employees were excessive. Finally, the Hospital operates the Visitors’ Parking Garage at a loss. Accordingly, the court is satisfied that the Management Agreement between the Hospital and Gateway meets the requirements of the profit test as articulated in Paper Mill Playhouse, and therefore, the Visitors’ Parking Garage area is exempt from taxation.
B. Aramark Contract
Atlantic entered into a Managed Services Agreement with Aramark Healthcare Support Services, Inc. (“Aramark”), which provides food and nutrition services, catering,[70] environmental services, laundry and linen distribution, patient transportation, and plant operations maintenance. The Managed Services Agreement provides that Atlantic pay Aramark a management fee and also sets forth Aramark’s annual budget. Every year Aramark is required to stay within the budget. If costs exceed the budget, then Aramark is responsible for that excess up to 25% of its management fee. If expenses are kept below budget, then Ara-mark would keep 10% of those savings, and the remaining would go to the Hospital.
Aramark provides supervisory personnel only; all services covered by the Managed Services Agreement are otherwise carried out by Hospital employees. With regard to the supervisory staff provided by Aramark, Aramark is solely responsible for all matters related to the payment of federal and state payroll taxes, worker’s compensation insurance, salaries, and fringe benefits of its employees. The Hospital reimburses Aramark for salaries and other expenses incurred by Aramark.
According to Dr. Conroy, the services provided by Aramark are included in the Hospital bill submitted to patients:
*530 The hospital bill are for the technical services delivered while in the hospital. That bill pays for nurses, technology, the overhead, the lights, you know, the back-up emergency responders. That’s what the hospital bill pays for. And the physician bill pays simply for their professional services.
All revenue from these services that are included in the Hospital bill is paid to the Hospital. Dr. Conroy stated, “we received all the revenue from the technical component. We paid for the staff that was there.”
There was no testimony as to whether the Hospital incurred a profit or a loss as a result of the services provided by Aramark. However, unlike the Hospital’s agreement with Gateway, which included only a fixed management fee, the Hospital contracted with Aramark to include a ninety pereent/ten percent (90-10) split of budgetary “savings.” Whether the ninety pereent/ten percent (90-10) split is characterized as incentive compensation or profit-sharing disguised as cost-savings, the Hospital’s arrangement with Aramark evidences a profit-making purpose, much the same as the agreement with the coffee shop addressed in Jersey Shore.
Similar to Jersey Shore, the Hospital’s agreement with Aramark demonstrates that both parties contemplated the generation of additional revenue in the form of reduced expenses. This additional revenue was then split between the Hospital and Aramark. The court finds there is no meaningful distinction whether profit comes in the form of increased revenues or decreased expenses. Given that the contract here also contemplates increased expenses, the cost of which was also to be split between the Hospital and Aramark, such an arrangement is typical of “commercial activity or business venture.” Blair, supra, 95 N.J.Super. at 590, 232 A.2d 178.
Accordingly, the Hospital agreement with Aramark violates the profit test as articulated in Paper Mill Playhouse, and the corresponding areas of the Hospital where Aramark operates are subject to taxation.
XII. Gift Shop
The Subject Property contains a small on-site gift shop (the “Gift Shop”) located on the first floor that sells various items *531 including “flowers, cards, candy, wraps, things that you would bring a patient in a hospital”. The gift shop is run by the Women’s Association (a.k.a. the Women’s Auxiliary), a charitable group that was affiliated with the Morristown Foundation and focused on charitable activities. Since the gift shop is run by volunteers, it was able to generate a small profit and dedicates the majority of funds collected to various hospital projects of its choosing. The majority of the gift shop workers are volunteers, however, it is unclear whether there is also a paid employee who works there.
Whether the gift shop, satisfies the second prong (use test) of Paper Mill Playhouse was left unresolved in the court’s partial summary judgment order of June 20, 2014. The matter will now be addressed here:
A. Reasonably Necessary Test
When determining whether a property is actually used for a tax-exempt purpose, the Tax Court evaluates whether the property is “reasonably necessary” for such tax-exempt purposes. Roman Catholic Archdiocese of Newark v. East Orange City, 18 N.J.Tax 649 (App.Div.2000) (citing City of Long Branch v. Monmouth Med. Ctr., 138 N.J.Super. 524, 532, 351 A.2d 756 (App.Div.1976), aff'd, 73 N.J. 179, 373 A.2d 651 (1977)).
The reasonably necessary test arose out of the Appellate Division’s decision in Township of Princeton v. Tenacre Foundation, 69 N.J.Super. 559, 174 A.2d 601 (App.Div.1961). In Tenacre, the court determined that a corporate director’s on-site residence, part of a non-profit corporation operating a sanatorium and nursing home, was “reasonably necessary for the efficient functioning of the institution.” Id. at 563-65, 174 A.2d 601. The residence enabled the director to be available, on-site, twenty-four hours a day, making it an integral part of the hospital organization’s operations, rather than merely a convenience. Therefore, the Appellate Division concluded that the property was reasonably necessary and the use requirement for tax exemption was met. Id.
The reasonably necessary test has been applied to various hospital-owned, ancillary (non-medical) properties or buildings by *532 subsequent courts. Property used for non-medical, but arguably supportive, operational purposes has been considered reasonably necessary to a “hospital purpose” whenever it has assisted the hospital’s functioning as a twenty-four hour, continuous care operation. Id. at 563, 174 A.2d 601. See generally City of Long Branch v. Monmouth Medical Center, 138 N.J.Super. 524, 351 A.2d 756 (App.Div.1976). See also Long Branch, supra, at 532-533, 351 A.2d 756 (citing the reasonably necessary test to determine that housing for a hospital’s resident doctors, interns, and nurses was reasonably necessary for the hospital to operate as an efficient twenty-four hour, continuous care facility.); Perth Amboy Gen. Hosp. v. City of Perth Amboy, 176 N.J.Super. 307, 422 A.2d 1331 (App.Div.1980) (finding that condominium housing for resident and intern physicians was tax exempt despite being located one and a half miles from the main hospital building); City of Summit v. Overlook Hosp. Ass’n, 4 N.J.Tax 183, 192-93 (Tax 1982) (finding hospital’s off-site housing for resident physicians, surgical students, nurses, laboratory technicians and x-ray technology students to be reasonably necessary for the hospital’s purpose to provide emergency care and qualified staff); Overlook Hosp. Ass’n v. City of Summit, 6 N.J.Tax 90, 96 (Tax 1983) (finding that the parking garage was reasonably necessary for hospital purposes because it assisted the hospital employees and medical staff who operate the hospital and also provided a needed service for visitors, who are necessary to the well-being of patients.); and Jersey Shore, supra, 14 N.J.Tax at 60, 68 (granting exemption for a day care center because its use furthered a core aspect of the hospital’s services by providing “continuous medical and nursing care.”).
In Hunterdon Medical, the Court determined that “the reasonably necessary test adds no substantive component to an analysis of the exempt purpose, [i.e.J ‘hospital purposes.’ ” Hunterdon Med. Ctr., supra, 195 N.J. at 568, 951 A.2d 931. The Court then explained that, “The key is to infuse meaning into the concept of “hospital purposes” so that the statutory exemption can be consistently applied.” Id. The Court found that “any medical service that a hospital patient may require pre-admission, during a hospi *533 tal stay, or post-admission, constitutes a presumptive core “hospital purpose” under N.J.S.A. 54:4-3.6.” Id. at 572, 951 A.2d 931. “Hospital purposes” has been broadly referred to by both Hunter-don Medical Center and Kuchera as any of the numerous patient services provided by a modern hospital.[71]
B. Analysis
In this ease, the Gift Shop does not satisfy the use test. The Gift Shop does not qualify as a core hospital purpose given that it does not provide “any medical service that a hospital patient may require pre-admission, during a hospital stay, or post-admission.” Id. The Gift Shop simply sells items that a visitor might bring to a patient in the hospital, or use for his or her own purposes.
However, even if the Gift Shop is not used to perform a core hospital purpose, it may nevertheless satisfy the use test if the activity is reasonably necessary for a hospital purpose. Here, the court finds that the Gift Shop is merely a convenience for hospital visitors who could otherwise purchase similar gift items at a variety of stores outside the Subject Property. The use of the Gift Shop is therefore, not reasonably necessary to any hospital purpose, but rather it serves as a form of competition to commercially owned facilities. For this reason, the Gift Shop fails the use test and is not exempt from taxation.
XIII. Auditorium, Day Care Area, Fitness Center, and Cafeteria.
The Subject Property also contains areas used as an auditorium, day care area, fitness center, and cafeteria. Various support *534 groups who were affiliated with the hospital and part of the community benefit assessment used the auditorium space for meetings. It was also used for purposes relating to the hospital’s officer election meetings, managers meetings, hospital operations, and community programs. It is not clear whether the support groups were required to pay for this use.
The day care area was available for use by hospital employee staff only. It is unclear as to the extent (if at all) private physicians were able to use the day care area, and by whom it was managed.
The fitness center was accessed by a badge and restricted to hospital employees who paid a “minor” amount of money (or fee) to use it. The area was unsecured for part of the day; it is uncertain as to the extent (if at all) it was used by non-employees.
The cafeteria operated under a management contract with Aramark (see Section XI B supra) and provided meals to hospital employees and visitors. The kitchen also prepared meals for the in-patient units of the hospital. The contract with Aramark provided supervisory personnel only and the balance of the staff were employees of AHS Hospital Corp. As part of the contract, Aramark kept ten percent of any unused portion of the cafeteria budget. In the event that there was a budget overrun, Aramark would be obligated to forfeit up to twenty-five percent of its management fee.
A non-profit organization that generates revenue in excess of expenses does not demonstrate, in itself, a profit making purpose. Hunterdon Med. Ctr., supra, 22 N.J.Tax at 318. The de minimis rule provides a narrow exception to the prohibition of profit making as it applies to non-profit organizations. An “incidental non-exempt activity, or a regular nonexempt activity which is of an inconsequential or de minimis character will not preclude an organization from obtaining tax exemption for its otherwise tax-exempt property.” Greenwood Cemetery Ass’n of Millville, Inc. v. City of Millville, 1 N.J.Tax 408, 414 (Tax 1980).
In Greenwood, the Division of Tax Appeals disqualified the caretaker’s residence portion of an otherwise exempt cemetery *535 property because his wife was operating her personal business out of the residence and pocketing the proceeds. The Tax Court concluded that the de minimis rule does not apply because “there was considerable business activity resulting in profit to a private individual.” Id. at 414. In Princeton University Press v. Princeton, the court similarly found that a printing press was not exempt from property taxes because it’s outside printing business was not of an “inconsequential or de minimis character” and was a “permanent endeavor designed specifically to make a profit,” Princeton University Press v. Princeton, 35 N.J. 209, 217, 172 A.2d 420 (1961).
In the present matter, the court finds that since there is no evidence that payments were collected by the Hospital for the use of the auditorium, that area satisfies the profit test and no further analysis is required. The Hospital’s fitness center also satisfies the profit test under the de minimis rule in Greenwood, which provides an exception for any profit made of an inconsequential nature. The small amount of hospital employees who actually used the Fitness Center paid a “minor”[72] fee, and the testimony does not indicate any considerable business activity or that any profit was made.
Limited testimony was provided regarding the day care area. It is clear that Hospital employees were able to use the day care area and patients were not. It is not clear, however, whether hospital tenants or private physicians could also use the day care area. It is equally unclear as to who managed the day care area, and no evidence was provided as to whether a fee was paid for day care services. The court finds that the facts are inconclusive to determine whether the day care satisfies the profit test. Accordingly, the Hospital failed to establish that the day care area meets the exemption requirements.
The cafeteria fails to satisfy the profit test as well. It was operated pursuant to a profit-sharing contract with Aramark, *536 which the court determined in Section XI B supra violated the profit test, without the need for further discussion here.
XIV. Conclusion
If it is true that all non-profit hospitals operate like the Hospital in this case, as was the testimony here, then for purposes of the property tax exemption, modern non-profit hospitals are essentially legal fictions;[73] and it is long established that “fictions arise from the law, and not law from fictions.”[74] Accordingly, if the property tax exemption for modern non-profit hospitals is to exist at all in New Jersey going forward, then it is a function of the Legislature and not the courts to promulgate what the terms and conditions will be. Clearly, the operation and function of modern non-profit hospitals do not meet the current criteria for property tax exemption under N.J.S.A. 54:4-3.6 and the applicable case law.
Therefore, for the reasons set forth hereinabove, with the sole exceptions of the auditorium, fitness center, and the visitors’ garage, the Hospital’s claim for property tax emption is denied based on the court’s findings that the Subject Property is being used substantially for profit.[75]
*537 The Hospital’s tax appeals challenging the omitted assessments on the Subject Property for the tax years 2006 and 2007, and the tax assessment for the tax year 2008 shall proceed at a later date. The court retains jurisdiction.
*538 [[Image here]]
*539 [[Image here]]
*540 [[Image here]]

 Now known as Morristown Medical Center.

 "[I]f you narrow the tax base by exempting some property, everyone else pays more____ The effects of the exemption are exacerbated by the fact that *465 nonprofits use local government services." The public policy for "[exempting nonprofits from tax is grounded in the belief that they provide some service to society that, in their absence, would have to be provided by government. But for most nonprofits, that is not true.” David Brunori, It’s Time To End Property Tax Exemptions — For Everyone, Forbes Magazine, Feb. 14, 2015, available at http://www.forbes.com/sites/taxanalystsl2015/Q2/14/its-time-to-end-property-tax-exemptions-for-eve¡yone/ (last visited June 25, 2015).

 The court's September 29, 2010 opinion mistakenly states that oral argument was heard on August 29, 2010, which was a Sunday.

 The court denied partial summary judgment for the Gift Shop with respect to the second (use) prong of the test in Paper Mill Playhouse, explaining that the Hospital failed to demonstrate that the Gift Shop was actually used for hospital purposes. Accordingly, that issue is also before the court.

 The court denied partial summary judgment in an order dated April 3, 2014, finding genuine issues of material fact as to whether "Support Departments” and "Support Services" were actually used for hospital purposes (including but not limited to "Supplies,” "Dock," “Linen," "Sterile Processing,” "Trash,” "Library,” “Conference,” “Auditorium," "Cafeteria,” "Kitchen,” "Medical Records,” "IS/IT," "Housekeeping," "Pediatric Admin/Support,” "Offices," "Medical Admin. Volunteers," "Gift Shop," "Phys. Lounge,” "Chapel,” "Administration," "Access/OP Lab," "Plant Engineering," "Clinical Engineering,” "Resident On Call,” "Cardiology Administration,” "Department Medicine,” "Admin.," "Daycare,” and "Security"). The court later granted partial summary judgment on June 20, 2014, finding that the "Support Departments” and "Support Services” were actually used for "hospital purposes," with exception to the area operated as the Gift Shop, and thus satisfying the second prong of the test set forth in Paper Mill Playhouse.

 There are additional facts contained in the court's prior opinions of May 4, 2010, September 29, 2010, and November 25, 2013, which need not be repeated at length here.

 Noted in the court's letter opinion of November 25, 2013, which it now incorporates herein.

 Morristown Memorial, Overlook, and Mountainside each had its own parent corporation: Memorial Health foundation, Inc., Overlook Health System, Inc., and Mountainside Hospital healthcare, Inc., respectively. As part of the consolidation of the three hospitals, each of their parent corporations was merged into Atlantic, thus creating the new parent corporation. Mountainside was part of the Hospital during the years at issue but was subsequently sold to Merit Health Systems, LLC, a for-profit hospital system.

 Mr. Sepaniak testified that, to his knowledge, there were no for-profit hospitals in New Jersey at the time the Hospital was organized.

 The Hospital revised and re-submitted this chart several times during the trial; Appendix A is the final version in evidence.

 Atlantic controls all the stock in the for-profit subsidiaries of the Hospital. As for the non-profit affiliates, Atlantic was the sole member.

 One such property owned by AHS investment is Franklin Village, a 256-unit apartment complex located adjacent to the Hospital. Its purpose is to provide housing for nurses, doctors, residents, housekeeping, and other hospital staff. This property is separate from the Subject Property; it does not enjoy a real property tax exemption and AHS Investment pays the annual property taxes.

 The Hospital also carries commercial insurance in the event of excess insurance claims or catastrophic losses. However, by self-insuring against the majority of claims, the Hospital was able to reduce its premium payments as compared with commercial premiums. All remaining insurable interests such as commercial automobile coverage for ambulances, property insurance, and directors and officers insurance were obtained from commercial carriers.

 The employees at Morristown Surgical Center at Madison Ave, LLC, however, were employed by the Hospital. Morristown Surgical Center reimbursed the Hospital for this expense.

 However, Mr. Sepaniak was asked to what extent did the Hospital President and CEO, Joseph Trunfio "do anything separate and apart for [Atlantic] Systems that he didn't do for Hospital Corp.?” Mr. Sepaniak responded: "[w]ell, you know, ... it’s sometimes hard to unscramble that egg."

 The Subject Property is designated as a level 1 trauma center by the American College of Surgeons, but is classified as a level 2 trauma center by the State of New Jersey.

 There was little testimony on, or support for, just how vast an area the Hospital serves beyond the greater Morristown area. Dr. Conroy made reference to certain medical specialties drawing from Pennsylvania, northern New Jersey, and the greater New York City areas. But see Dartmouth Atlas-Defined Hospital Referral Regions for New Jersey Area, Appendices for Final Report, 2008, Appendix 1, available at http://www.dartmouthatlas.org/data/region/ (last visited June 25, 2015), delineating a specific Morristown hospital referral region, that includes some, but not all parts of northern New Jersey, and only a few parts of Pennsylvania and New York along the upper Delaware River region, but not New York City or its immediate suburbs.

 Medicare is a federal program that seniors become eligible to enroll into at age 65. Medicare provides coverage for medical costs associated with hospital services (part A), physician services (part B), post-acute nursing services (part C), and drug services (part D).

 Medicaid is a federal program that provides funding for states to distribute for medical care of indigent persons. The criteria for eligibility to enroll in this program is determined by each state.

 There was no testimony as to how the "cost" was determined nor the rate at which services were billed.

 According to Dr. Conroy, these physicians were employed to provide care at the Hospital that would otherwise not be economically viable in the community. She testified that pediatric physicians were often not able to support themselves as private physicians in the community. To ensure that pediatric care would continue to be offered in the area, the Hospital purchased these private practices and employed the pediatric physicians. However, no evidence of the economic viability of pediatric or adolescent psychiatry practices was offered at trial.

 However, not all of the 1,200 physicians treated patients at the Subject Property. Due to insurance requirements, some voluntaiy physicians who had privileges at the Subject Property would actually treat patients in their own medical offices and then refer the patient for further treatment at the Subject Property.

 Mr. Lenahan negotiated the contracts with Blue Cross regarding reimbursement amounts (although during the years in question it would have been Kevin Shanley).

 The Hospital erroneously cites to L. 1918, c. 236, § 203, as the first New Jersey tax statute to specifically provide property tax exemption to hospitals. See YWCA v. Monmouth County Board of Taxation, 92 N.J.L. 330, 105 A. 726 (Sup.Ct.1919) (interpreting L. 1913, p. 570 in an appeal challenging the denial of a tax year 1917 property tax exemption as contemplated by that statute.)

 Neither party presented testimony on the history of hospitals. However, both Mr. Sepaniak and Dr. Conroy testified that, throughout their respective professional experience working with non-profit hospitals (about 40 years), such hospitals have always operated as they do today. Dr. Conroy attempted to testify further that non-profit hospitals have always operated as they do today. As the statement was not within the personal knowledge of Dr. Conroy, and she was not qualified as an expert on the matter, her testimony on that point was disallowed by the court.

 "Benjamin Franklin was instrumental in the founding of Pennsylvania Hospital in 1751____" Barbara Mann Wall, PhD, RN, FAAN, Histoiy of Hospitals, available at Histoiy of Hospitals, available at http://www.nursing.upenn.edu/ nhhc/Welcome% 20Page% 20Content/Histoiy% 20of% 20Hospitals.pdf (last visited June 25, 2015).

 Pennsylvania’s Supreme Court found that "Many good men and women, liberal in purse and generous in soul, set up houses to heal the poor and homeless victims of disease and injury. They made no charge for this care. The benefactors felt themselves richly rewarded in the knowledge that they were befriending humanity." Flagiello v. Pennsylvania Hospital, 417 Pa. 486, 493, 208 A.2d 193 (1965), reviewed by P.V. ex rel. T.V. v. Camp Jaycee, 197 N.J. 132, 962 A.2d 453 (2008); See also John D. Columbo, The Charitable Status of Nonprofit Hospitals: Toward a Donative Theory of Tax Exemption, 66 Wash. L.Rev. 307, 318 (April 1991) ("Nonprofit hospitals have been characterized as voluntary since the [Njineteenth century, when they were organized by religious societies, heavily funded by donations, and staffed by doctors who worked without compensation and nurses who worked for room and board as part of their lifetime commitment to a religious order devoted to caring for the poor.”) (emphasis added).

 For further reading on this point, see the following law review excerpt:
Until the early 1900s, the vast majority of patient care was performed in either the physician's office or in the patient's home____ Popular opinion at the time was that hospitals in general were so poorly run as to bring 'discredit upon the medical profession.' Physicians avoided sending their patient to hospitals as 'the hospital had no special advantages over the *481 home.... One estimate suggests that only two percent of physicians had hospital privileges.
[Katharine Van Tassel, Hospital Peer Review Standards and Due Process: Moving from Tort Doctrine Toward Contract Principles Based on Clinical Practice Guidelines, 36 Seton Hall L.Rev. 1179, 1189 (2006) (emphasis added).]
See also Samoilov v. Raz, 222 N.J.Super. 108, 116, 536 A.2d 275 (App.Div.1987) ("[W]hen our common law rules were taking shape, surgery, even a major operation, was generally performed in the home of the patient ...") (emphasis added).

 "Between 1865 and 1925 in all regions of the United States, hospitals transformed into expensive, modern hospitals of science and technology. They served increasing numbers of paying middle-class patients. In the process, they experienced increased financial pressures and competition." Wall, supra note 26.

 For further reading on this point, see the following article excerpt:
[In] 1894 with the enactment of the first [federal] corporate income tax [Rev. Act of 1894, ch. 349 § 32], legislators were accustomed to a society in which, *482 both through history and contemporary practice, hospitals were closely associated with charity and religion. Thus, it is not difficult to see why hospitals were classified as charitable, and swept into the first corporate income tax's exemption for 'corporations, companies, or associations organized and conducted solely for charitable, religious or educational purposes.' It would have required vision in 1894, or even in 1913, that nonprofit hospitals should be granted an exemption premised on a social benefit not necessary [sic.] related either to charity or religion.
[Helena G. Rubinstein, Nonprofit Hospitals and the Federal Tax Exemption: A Fresh Prescription, 7 Health Matrix 381, 393 (Summer 1997) (emphasis added).]
"The U.S. Supreme Court declared portions of [Rev. Act of 1894, ch. 349 § 32] to be unconstitutional, and the Act did not become effective. It was reenacted in 1913, by the Income Tax Act of 1913, ch. 16, § II(G)(a), 38 Stat. 114, 166-81.” Id. at 393, n. 55.

 Because the historical overview of hospitals provided in Section II of the article was not part of the evidence at trial, the court afforded counsel the opportunity to comment on it in writing prior to its inclusion in, and the issuance of, this opinion. In a letter dated March 27, 2015, Morristown’s counsel advised that "Section II provides a helpful brief and cursory summary of the history of American hospitals." In a letter dated March 30, 2015, the Hospital's counsel registered a general objection to the court’s consideration of the history of American Hospitals contained in Section II. In so objecting, the Hospital’s counsel conceded that "[t]he facts described [in Section II] regarding the evolution of hospitals, from a time when 'very few physicians practiced medicine in a hospital ... ’ to a time when 'hospital-based medicine [was] the preferred method of medical care,’ are widely known and accepted." The Hospital's counsel specifically objected to the author’s "assertion that hospitals operated 'much more like businesses' [as] vague, misleading and not supported by any fact.” The court is satisfied, however, that the author sufficiently explained her intent and meaning in the sentences preceding and following the objectionable assertion. Furthermore, as noted in the Introduction of this opinion, our Supreme Court has also recognized that "a hospital is a complex business...." Belmar, supra, 96 N.J. at 207, 475 A.2d 533. The Hospital’s counsel also specifically objected to the author's discussion of Section 501 (c)(3) in the article as "incomplete.” The court considered the objection and determined that the discussion of Section 501(c)(3) was not relevant to the issue before this court, and therefore did not include or consider it. No other parts of the article, other than Section II, were considered by the court.

 While Kuchera involves the applicability of the Charitable Immunities Act the Court observed that:
|T]he meaning of the phrase "organized exclusively for hospital purposes" [was discussed] in Hunterdon Med. Ctr. v. Township of Readington, 195 N.J. 549, 951 A.2d 931 (2008). The discussion arose in the context of whether an offsite facility owned and operated by a nonprofit hospital was exempt from local property taxation. We recognize that whether real property and improvements thereon are exempt from local property taxation and whether an entity satisfies the criteria for immunity from liability for negligence implicate different statutory provisions and public policy concerns. Nevertheless, the view expressed by this Court regarding the organization and role of a modern hospital is instructive.
[Kuchera, supra, 221 N.J. 239, 111 A.3d 84.]

 In their letter of May 30, 2015 objecting to the court’s consideration of the history of hospitals contained in Coley, supra, 34 Seton Hall legis. J. 275, the Hospital's counsel claim that "what [the author] does not make particularly clear is that this evolution [of hospitals] occurred before 1918." The Hospital's counsel, however, offered no authority to support that claim; they cited no contrary account of the history of hospitals, no case law, nor scholarly works. Moreover, the court was unable to find any support for that claim. Accordingly the court is satisfied that counsels’ claim is mere conjecture and self-serving.

 See also L. 1854, c. 113, p. 296 (Supplement etc. § 5, II).

 "The following ... uses declared by statute and adjudged cases to be valid, as pious and charitable, for which property could be held prior to the 43 *486 Elizabeth ... [included] ... Hospitalities. 17 Edward II. 15 Richard II — [and] ... Lazars in Hospitals. 2 Henry V." Rights of Unincorporated Companies, Hazard's Register of Pennsylvania, Vol. XIV, No. 22, November 29, 1834, No. 360, p. 346 (emphasis added). The term Lazars in Hospitals refers to "specialized ... hospitals] ... [c]alled Lazar houses after the biblical Lazarus ..., these hospitals were refuges for lepers.” Paul B. Newman, Daily Life in the Middle Ages 269 (McFarland 2001). The term Hospitalities includes hospices, hotels, and hospitals. See generally Christine D. Pohl, Making Room: Hospitality as a Christian Tradition (1999), p. 47. “In the Middle Ages ... three institutional settings were important for the practice of hospitality: Monasteries and their hospices for pilgrims; hospitals; and the great ecclesial and lay households." Id. at 48 (emphasis added).

 43 Elizabeth, c. 4 was preceded by 39 Elizabeth, c. 5:
39 Elizabeth, chap. 5 ... was continued in force until repealed by 9 George 2. From the circumstance that the charities were put down by the destruction of the monasteries arose the necessity of [39 Elizabeth, ch. 5] and [43 Elizabeth, ch. 4] which intended to lessen the evil of pauperism by hunting up charities, but which established no new principle in the laws of England. 4 Inst. 66. 2 Gibson’s Codex, 1155, where the statute of 39 Elizabeth is found. This last law is a general one, and covers a larger extent of ground than the 43 Elizabeth, chap. 4. Chapters 2 and 3 show the character of chap. 4. Chap. 2 is a poor-law, and so is chap. 3, for mariners. The 43 Elizabeth enumerates twenty-one charities, but the 39th comprehends all lawful ones. Hospitals were included in the latter but not in the former.
[Vidal v. Philadelphia, 43 U.S. 127, 151-52, 2 How. 127, 11 L.Ed. 205 (1844).]

 "[The] ‘conservative provisions’ [of the statute of 43 Elizabeth, c. 4], ‘have [also] been in force in Pennsylvania by common usage and constitutional recognition; and not only these but the more extensive range of charitable uses which chancery supported before that statute and beyond it.’ ” Vidal, supra, 43 U.S. at 192 (citing Zimmerman v. Andres (January term, 1844). "[T]he law in Pennsylvania is the same as the law in all the other states except Virginia and Maryland." Id. at 150.

 See The General Tax Laws of New Jersey with Explanations and Instructions by the Attorney General, Trenton, 1863, p. 5 ("All the real estate in this State is to be assessed and taxed, excepting ... buildings erected and used exclusively for charitable purposes, and the lands necessary for the enjoyment of the said buildings, which, in no case, may exceed five acres____”) (emphasis added).

 In granting the exemption, the court employed a liberal application of the exemption standard that it would later question and distinguish in Sisters of *488 Charity v. Thompson, 72 N.J.L. 426, 61 A. 387 (Sup.Ct.1905), which it ultimately retracted in Sisters of Charity v. Cory, 73 N.J.L. 699, 65 A. 500 (E. & A.1907). The retraction, however, pertained only to the exemption standard and not to the court’s interpretation that exclusively meant solely. Id. at 706-07, 65 A. 500.

 See Cooper Hospital v. Burdsall, 63 N.J.L. 85, 42 A. 853 (Sup.Ct.1899) ("the Tax law of 1866 ... with slight alterations ... was embodied in the act of 1894....”).

 This case also clarified two prior rulings: Sisters of Charity, supra, 52 N.J.L. 373, 20 A. 292 — exemption was granted for the entirety of the property because it was actually used for charitable purposes; and Cooper Hospital, supra, 63 *489 N.J.L. 85, 42 A. 853 (1899) — Exclusive use for a charitable purpose does not automatically exempt a property from taxation. Rather, there must be actual use. Id.

 In Kuchera, supra, 221 N.J. 239, 111 A.3d 84, the New Jersey Supreme Court addressed the Legislature's different treatment for immunity purposes pursuant to N.J.S.A. 2A:53A-7 and -8 of the Charitable Immunity Act ("CIA”), between "nonprofits organized exclusively for charitable, religious, or educational purposes, and those organized for hospital purposes." The Court noted that "[t]o emphasize the distinction ... charitable, religious, or educational purposes, and ... hospital purposes [where placed] in separate sections.” Id. The Court also recognized, however, "that whether real property and improvements thereon are exempt from local property taxation and whether an entity satisfies the criteria for immunity from liability for negligence implicate different statutory provisions and public policy concerns.” Id.

 In 1985 the Legislature eliminated the requirement that hospital-owned property be “exclusively” used for hospital purposes. L. 1985, c. 395. The amendment was in response to City of Long Branch v. Monmouth Medical Center, 138 N.J.Super. 524, 351 A.2d 756 (App.Div.1976), which denied an exemption for a clinic building because a portion of it was rented to a pharmacy and therefore the building was not "actually and exclusively used" for hospital purposes. Id. at 538, 351 A.2d 756.

 This test was applied by New Jersey courts for thirty years leading up to the Kimberley School decision. Kimberley School, 2 N.J. at 34, 65 A.2d 500. The Court remarked that this misapprehension of law originated from the 1903 statute, L. 1903, c. 208, art. I, § 3, which included schools and religious and charitable institutions within the same paragraph. Id.

 Additionally, the Court found that the terms of the prior sale of the school were reasonable, as the purchase price did not include good will or personal property or equipment, but only the fair value of the land and building. Finally, the rate of interest and amortization were also determined by the Court to be reasonable.

 In response to the question: "And to your knowledge [RAP doctors’] compensation, both radiology and ED [i.e. emergency department], would be dependent upon their treatment of a patient and their private billing of the patient. They would keep that money!?]," Dr. Conroy responded: "That’s — that’s correct" (emphasis added).

 In City of New Brunswick, supra, 2 N.J.Tax at 414, the court determined that the plaintiff city "failed to demonstrate the [defendant] had a ‘money-making objective.' " While this language could suggest that the burden of proof was on *504 the city since the city was challenging the exemption, case law since City of New Brunswick has been clear that "[t]he burden of persuading the Tax Court that a tax exemption is merited is on the claimant ‘even when the county board has granted exemption and the appeal is by the municipality.’ " Bor. Of Hamburg v. Trustees of the Presbytery of Newton, 28 N.J.Tax 311, 317 (Tax 2015) (emphasis added) (citing Woods Court v. Woodstown Bor., 12 N.J.Tax 197, 203 (Tax 1992)). See also Jamouneau v. Tax App. Div., 2 N.J. 325, 330, 66 A.2d 534 (1949) ("The burden of proof is upon him who asserts a tax exemption to establish the asserted right."); see International Schools, supra, 207 N.J. at 15, 21 A.3d 1166 (citations omitted) ("It is a fundamental legal tenet that a statute granting exemption from property taxation, such as N.J.S.A. 54:4-3.6, is subject to strict construction and, further, that the party seeking exemption under its terms bears the burden of proving that the bases for it have been established.”).

 “[M]uch of the empirical literature on corporate ownership finds little difference among hospital types [i.e. non-profit or for-profit].” Jill R. Horwitz, *506 Making Profits and Providing Care: Comparing Nonprofit, For-Profit, And Government Hospitals, Health Affairs, available at http://content.healthaffairs.org/content/ 24/3/790.full (last visited June 25, 2015).

 The Organization did, however, get a modest "percentage or 'donation' from the sale of any artists' work sold in the Art Center." Riverview, supra, 26 N.J.Tax at 180.

 Affiliated or related entities were subsidiaries of the Hospital or its parent company, Atlantic, whereas non-affiliated, unaffiliated, or unrelated entities were not subsidiaries of either the Hospital or the parent company.

 These physician practices were in fact held in trust on behalf of AHS Hospital Corp., and not Atlantic Health System, Inc. as was inadvertently misstated during testimony.

 Tax returns in evidence, however, indicate that Mr. Shanley devoted 100% of his time to the Atlantic Health Management, Corp., the for-profit parent company of at least twelve other affiliated for-profit entities. Mr. Lenahan testified that this was not accurate, and maintained that Mr. Shanley only devoted minimal time to his role in these for-profits. The court accepts Mr. Lenahan’s clarification.

 To the degree that there was overlapping board membership between these various entities, then the ability to engage in arms-length transactions is seriously called into question. Without the ability to engage in an arms-length transaction, any legal separation in the dealings between a non-profit and a for-profit organization begins to dissolve.

 Mr. Lenahan indicated that the 2007 compensation figures for Mr. Kovach, Mr. Sepaniak, and Dr. Conroy are indicative of the other years as well

 "A common myth about nonprofit organizations is that salaries are low and can’t compare with the corporate world..... Salary is just one piece of how employees are compensated. While salary is the actual amount of money an employee earns (financial compensation), total compensation is the full picture of how an organization demonstrates the value of its employees, including benefits and perks.” Nonprofit Salaries: What Should I Earn?, Commongood Careers, available at http://commongoodcareers.org/articles/detail/nonprofit-salaries-what-should-i-eam (last visited June 25, 2015). “CEO compensation has become such a hot-button topic that several states — including New York, New Jersey, Florida, Massachusetts, New Hampshire and Illinois — have considered regulations that place limits on compensation for charity CEOs. And the IRS, the entity responsible for regulating charities at the federal level, continues to prioritize CEO compensation as one of its main areas of focus in uncovering fraudulent nonprofit practices.” Charity Navigator 2014 CEO Compensation Study, Charity Navigator (October 3, 2014), available at http://www.cha.rity navigator.org/index.cfm?bay=studies.ceo#.VUtqLUrD99A (last visited June 25, 2015) (emphasis added).

 The Court affirmed the Appellate Division decision, which affirmed the Tax Court ruling finding no evidence of excessive salaries. See International Schools Services, Inc. v. West Windsor Twp., 412 N.J.Super. 511, 527, 991 A.2d 848 (App.Div.2010).

 Consider further,
A ... study in JAMA Internal Medicine [which used 2009 salary data] reveals that a CEO at a nonprofit hospital earns, on average, about $600,000 a year and the median salary of a CEO at a large nonprofit urban hospital is over $1.66 million.
[N]onprofits have to compete with both the private sector and the government for employees. In many cases, a higher salary may be justified because of the high level of experience, education, and skills needed to run a large and complex organization.
This is especially true with regards to a nonprofit hospital. The JAMA study points out that the highest salaries are paid to executives at large, urban hospitals, which are frequently teaching institutions, while lower salaries with a median of about $ 118,000 go to those running smaller, rural, non-teaching hospitals.
[Million Dollar Pay at Nonprofit Hospitals, Charity Watch (November 19, 2013), available at https://www.charitywatch.org/charitywatch-articles/ million-dollar-pay-at-nonprofit-hospitals/138 (last visited June 25, 2015).]

 The three-step process promoted by the IRS (included in the instructions to the Form 990) to determine appropriate compensation is set forth as follows:
1. The board should arrange for an "independent body” (which means that the person receiving the compensation should not be part of the review process) to conduct a “comparability review." Many nonprofits task a "compensation committee,” or use their executive committee, or another sub-group/task force of board members, for this purpose.
2. The independent body should take a look at "comparable” salary and benefits data, such as data available from salary and benefit surveys, to learn what employers of a similar budget size that are located in the same, *519 or a similar geographic region, pay their senior leaders. Ideally, the comparison will include data from other nonprofits of a similar mission focus.
3. The board/independent body that is conducting the review should document who was involved and the process used to conduct the review, as well as the disposition of the full board’s decision to approve the executive director’s compensation (minutes of a meeting are fine for this). The documentation should demonstrate that the board took the comparable data into consideration when it approved the compensation.
Executive Compensation, National Council of Nonprofits, available at https:// www.councilofnonprofits.org/tools-resources/executive-compensation (last visited June 25, 2015).

 The court recognizes that the Hospital’s nonprofit status has not been challenged for federal tax purposes. While the lack of a federal challenge supports a finding that the Hospital is not operated for profit, this fact alone does not determine whether the Hospital satisfies the requirements for property tax exemption under N.J.S.A. 54:4-3.6. Paper Mill Playhouse, supra, 95 N.J. at 524, n. 7, 472 A.2d 517.

 According to the expert, "[t]he comparability data ... was obtained from Integrated's own proprietary data base as well as from reputable published surveys.” Neither the data nor surveys utilized were provided to the court. "The same data presented by [the predecessor firm] Towers Perrin in its report” was utilized by the expert for the peer group used by that earlier firm. The expert offered no testimony or other evidence as to whether the Towers Perrin data was verified, accurate, reliable, or in fact, comparable.

 See generally Richard Gunderman, Why Are Hospital CEO's Paid so Well, The Atlantic (October 16, 2013), available at http://www.theatlantic.com/health/ *521 archive/2013/10/why-are-hospital-ceos-paid-so-well/280604/ (last visited June 25, 2015) ("[M]ost hospital board members are not health professionals such as physicians and nurses.... [and] often lack the firsthand healthcare expertise ...”).

 But see The Dartmouth Atlas of Health Care, available at http://www. dartmouthatlas.org!'data/region/ (last visited June 25, 2015):
The use of health care resources in the United States is highly localized. Most Americans use the services of physicians whose practices are nearby. Physicians, in turn, are usually affiliated with hospitals that are near their practices. As a result, when patients are admitted to hospitals, the admission generally takes place within a relatively short distance of where the patient lives. This is true across the United States. Although the distances from homes to hospitals vary with geography — people who live in rural areas travel farther than those who live in cities — in general most patients are admitted to a hospital close to where they live that provides an appropriate level of care. Data for all Dartmouth Atlas regional data reflect the experience of Medicare patients living in the region, regardless of where the care was actually delivered.

 Further on this point:
The incidence of a tax on income differs from that of a tax on property. Neither tax is dependent upon the possession by the taxpayer of the subject of the other. His income may be taxed, although he owns no property, and his property may be taxed, although it produces no income. The two taxes are measured by different standards, the one by the amount of income received over a period of time, the other by the value of the property at a particular date. Income is taxed but once; the same property may be taxed recurrently. The tax on each is predicated upon different governmental benefits; the protection offered to the property in one state does not extend to the receipt and enjoyment of income from it in another.
[People of State of New York ex rel. Cohn v. Graves, 300 U.S. 308, 314, 57 S.Ct. 466, 81 L.Ed. 666 (1937).]

 California has its own standard; and a few other states are considering adopting their own.

 According to Dr. Conroy, the physician contract committee reviewed commonly used national surveys such as Sullivan, Kotter, and MGMA. These surveys, however, were not submitted to the court and are not in evidence, and there is no testimony as to their credibility or reliability.

 Dr. Conroy testified that it was common for Hospitals to include incentive provisions in their employment contracts, explaining it was important to pay their physicians competitively. However, other than her testimony, there is nothing in evidence concerning custom and practice as to employed physician's contracts.

 Non-ancillary revenues were the revenues collected for the actual treatment of patients, while ancillary revenues related to technical services and use of facility charges.

 The court granted partial summary judgment on September 8, 2014, finding that the West Garage, also known as the Women’s Association Garage, is assessed as Block 4201, Lot 2, and is therefore not at issue in this case, since this appeal focuses only on Block 4201, Lot 1.

 Although Mr. Sepaniak testified that all proceeds go to Atlantic, he likely misspoke, since he also testified that no revenue ever goes to Atlantic. Rather, the proceeds likely went to the Hospital, as did all other revenues. This is consistent with Mr. Sepaniak's use of “Atlantic” as a generic term to refer either to the Atlantic Healthcare System or the Hospital generally.

 See the discussion of the cafeteria as part of the Aramark Contract infra Section XIII.

 This expansion of the definition of "hospital purposes" was confirmed in Kuchera, which also found the definition to be overly restrictive. Kuchera, supra, 221 N.J. 239, 111 A.3d 84. In that case, the Court similarly expanded the definition of "hospital purposes” to reflect the many health-related pursuits of the modern hospital. This case is relevant because it draws upon tax law when the Court cites the New Jersey Supreme Court opinion in Hunterdon Medical Center. In reaching its decision, the Court cited a variety of cases, mostly other charitable immunity cases; nonetheless, the court finds this definition of "hospital purposes" to be instructive.

 Dr. Conroy testified that "employees paid a real minor amount" to use the fitness center. Only about 50 out of 5,500 employees used the fitness center.

 “FICTION OF LAW. The assumption that a certain thing is true, and which gives to a person or thing, a quality which is not natural to it, and establishes, consequently, a certain disposition, which, without the fiction, would be repugnant to reason and to truth. It is an order of things which does not exist, but which the law prescribe; or authorizes it differs from presumption, because it establishes as true, something which is false; whereas presumption supplies the proof of something true. Bouvier’s Dictionaiy of Law (4th ed. 1856), available at http://ecclesia.org/tmth/bouviers.html (last visited June 25, 2015) (citing Dalloz, Dict. h. t. See 1 Toull. 171, n. 203; 2 Toull. 217, n. 203; 11 Toull. 11, k. 10, note 2; Ferguson, Moral Philosophy, part 5, c. 10, § 3 Burgess on Insolvency, 139, 140; Report of the Revisers of the Civil Code of Pennsylvania, March 1, 1832, p. 8).

 “Les fictions naissent de la loi, et non la loi des fictions.” Id.

 By letter of June 25, 2015, the Hospital's counsel requested that the court "delay issuance of the ... decision in this matter for 30 days, to enable the parties to pursue ... settlement negotiations." Morristown's counsel generally made no objection. The decision in this regard lies within the discretion of the court; accordingly, the Hospital's request is denied. This matter has been *537 pending since 2007. The parties and the court endured a lengthy trial; in fact, the trial was halted for a week to allow the parties to attempt to settle — to no avail. There is currently no settlement pending; the Hospital, in essence, is requesting more time to negotiate, which again, may amount to nothing. More importantly, the court has now had the opportunity to view all the evidence presented at trial and it is clear that the Hospital does not meet the criteria for property tax exemption for nearly all of the Subject Property. Therefore, any settlement agreement at this point, • which may provide the Hospital with a greater property tax exemption then this court determined it was entitled to by virtue of the evidence, would be improper and must be rejected by the court. The parties are free to negotiate a settlement on the remaining tax appeals yet to be tried.